# Illinois Official Reports

## Appellate Court

---

### *People v. Kirkpatrick*, 2020 IL App (5th) 160422

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ELISA KIRKPATRICK, Defendant-Appellant. |
| District & No. | Fifth District<br>No. 5-16-0422 |
| Filed<br>Rehearing denied | April 10, 2020<br>June 5, 2020 |
| Decision Under Review | Appeal from the Circuit Court of Williamson County, No. 15-CF-304; the Hon. Brian D. Lewis, Judge, presiding. |
| Judgment | Affirmed in part and reversed in part. |
| Counsel on Appeal | James E. Chadd, Ellen J. Curry, and Lawrence J. O'Neill, of State Appellate Defender's Office, of Mt. Vernon, for appellant.<br><br>Brandon Zanotti, State's Attorney, of Marion (Patrick Delfino, Patrick D. Daly, and Sharon Shanahan, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |

JUSTICE OVERSTREET delivered the judgment of the court, with opinion.
Justice Boie concurred in the judgment and opinion.
Justice Cates concurred in part and dissented in part, with opinion.


# OPINION

¶ 1      Following a bench trial in the circuit court of Williamson County, the defendant, Elisa Kirkpatrick, was found guilty on four counts of practicing veterinarian medicine without a valid license, six counts of violating an animal owner's duties, and one count of aggravated cruelty to a companion animal. On appeal, the defendant maintains that her convictions on the seven latter counts should be reversed due to insufficient evidence. For the reasons that follow, we reverse the defendant's conviction for aggravated cruelty to a companion animal and affirm her convictions on the remaining counts.

¶ 2                                    BACKGROUND

¶ 3      In June 2015, the State filed an information charging the defendant with numerous violations of the Humane Care for Animals Act (510 ILCS 70/1 *et seq.* (West 2014)) and the Veterinary Medicine and Surgery Practice Act of 2004 (225 ILCS 115/1 *et seq.* (West 2014)). In May 2016, the State filed an amended information alleging 12 specific counts. Count I charged the defendant with aggravated cruelty to a companion animal (510 ILCS 70/3.02 (West 2014)), counts II-VI charged her with practicing veterinarian medicine without a valid license (225 ILCS 115/5 (West 2014)), and counts VII-XII charged her with violating an animal owner's duties (510 ILCS 70/3 (West 2014)). Counts I through III pertained to a dog named "Chief," counts IV and V pertained to a dog named "Max," count VI pertained to a cat named "Tom," count VII pertained to a dog named "Shane," and counts VIII through XII pertained to several "caged" dogs that were physically described but not named. Count I specifically alleged that the defendant committed the offense of aggravated cruelty to a companion animal by intentionally performing a surgical operation on Chief "in an unsterile manner at her private residence, thereby committing an act that caused the companion animal's death." Count VII specifically alleged that the defendant "knowingly failed to provide veterinarian care as needed to prevent the suffering of 'Shane,' a dog that due to a serious infection, chewed its leg off, exposing its flesh and bone." In July 2016, the cause proceeded to a three-day bench trial where the following evidence was adduced.

¶ 4      In 1993, the defendant received a doctorate degree in veterinary medicine from the University of Illinois and was issued a license to practice veterinary medicine by the Illinois Department of Financial and Professional Regulation. The defendant subsequently worked as a licensed veterinarian in the Carbondale-Marion area until January 31, 2011, when her license expired, apparently due to her inadvertent failure to renew it. After January 31, 2011, and before her license was reinstated in December 2011, the defendant continued to practice veterinary medicine from her clinic in Carbondale. As a result, in December 2014, the defendant's license was suspended, and she was ordered to pay a $10,000 fine. At trial, the defendant acknowledged that, despite the suspension of her license and her closure of her

clinic, she had continued to practice veterinary medicine by working out of her home in rural Creal Springs and providing pickup/drop-off service for her customers.

¶ 5    In January 2015, the defendant's father passed away from lung cancer. The defendant did not work for several months preceding her father's death, and she eventually fell behind on her bills. By mid-May 2015, the electrical service to the defendant's home had been disconnected, and her mortgage lender had commenced foreclosure proceedings against her.

¶ 6    On Wednesday, May 20, 2015, after performing a routine castration on Max, the defendant returned him to his owner, Robert Marlow, with instructions to keep an Elizabethan collar on Max's head to prevent him from biting his surgical wound. Prior to castrating Max, the defendant had been his veterinarian for several years, and she had also treated Marlow's other pets.

¶ 7    On Thursday, May 21, 2015, the defendant collected Chief from his owner, Jason Snoddy. Snoddy advised the defendant that Chief had recently been sick and that a veterinarian in Missouri had advised that Chief had a potentially cancerous tumor on an undescended testicle that needed to be removed. Because the defendant had been Chief's veterinarian since the dog's birth in 2008, Snoddy asked her to perform the surgical procedure, and she agreed to do so. The defendant advised Snoddy that the surgery would be risky given Chief's condition and prior health problems.

¶ 8    On the afternoon of Friday, May 22, 2015, after removing Chief's tumor, the defendant called Snoddy and reported that Chief had survived the operation and was stable and awake. The defendant advised that she wanted to observe Chief overnight and would return him home the next day.

¶ 9    Several hours later, Marlow called the defendant and advised her that Max had been biting and scratching his surgical wound after destroying the Elizabethan collar that he was supposed to be wearing. The defendant agreed to pick up Max for follow-up care, and when she did so, she saw that he had chewed out all of his sutures. After collecting Max, the defendant ran some errands before returning home later that night.

¶ 10    Meanwhile, a process server, who had been to the defendant's house while she was away, called the Williamson County Sheriff's Department and reported that a strong odor of death was emanating from the home and that no one was answering the door. The server further reported that there were dogs barking inside.

¶ 11    When officers with the sheriff's department and the Williamson County animal control department subsequently went to the defendant's house to conduct a welfare check, they looked through the windows and discovered an "animal hoarding" situation. They also saw that the electricity to the residence had been "locked off" by the power company. Plastic garbage bags containing trash and animal feces were visible in the front yard, on the home's wrap-around porch, and in the bed of a pickup truck that was parked in the driveway. A search warrant for the house was soon obtained, and the Williamson County fire protection district was ordered to assemble a team and report to the scene with hazardous-materials suits and lighting.

¶ 12    When the authorities subsequently entered the defendant's house to investigate, they saw that the conditions inside were deplorable. Dozens of animals were found in the home, and large areas of the floors were covered in layered animal feces. The animals in the home included a cockatoo, an opossum, a pot-bellied pig that was running loose in the basement, and

a feral bobcat that was being kept in a bedroom. Numerous cats in stacked rusty cages were found in the kitchen, and numerous dogs in like cages were found in the basement. Scores of bagged, decomposing animal carcasses, most of which were inside or atop of deep freezers, were also found in the basement. Additional dogs living in pens were found in a barn behind the house, along with three donkeys, a rooster, a rabbit, and a cow.

¶ 13      On and around the island counter in the defendant's kitchen, medical supplies including syringes, isoflurane, rubber gloves, and scalpels were discovered. Chief was found lying in a crate on the kitchen floor in "obvious distress," and Shane was found in another crate nearby. Shane's left hind paw was missing, the metatarsals of his left hind leg were significantly protruding, and the lower part of the leg surrounding the bones was predominantly skinless. One of the cats caged in the kitchen was Tom.

¶ 14      At approximately 10:30 p.m., while the live animals were being removed from the defendant's house, the defendant returned home with Max. After relinquishing custody of Max, the defendant agreed to proceed to the Williamson County Sheriff's Department, where she was interviewed by Captain Brian Thomas. When later advised of the situation at the defendant's house, Marlow arrived at the scene and took possession of Max, and Snoddy arrived and took possession of Chief.

¶ 15      The defendant's interview with Captain Thomas commenced shortly before midnight and lasted about an hour. During the course of the interview, the defendant advised Thomas that other than Max, Chief, and Tom, all of the animals found in her home were either her pets or animals that she had accepted from local rescue shelters. The defendant indicated that most of the cats and dogs were going to be euthanized had she not adopted them. Stating that she loved her animals, the defendant repeatedly asked Thomas whether she would be able to get them back. In response, Thomas advised the defendant that her obvious love of animals had become a problem because she had "become a hoarder." He further advised the defendant that, at the very least, she would have to clean up her house and have the power restored before regaining possession of the animals would even be a possibility.

¶ 16      The defendant acknowledged that she had been practicing veterinary medicine from her home without a license and that her clients were unaware that her license had been suspended. She explained that, paradoxically, she had been providing unlicensed veterinary services because she needed to earn money to get her license back. She further explained that keeping all her animals fed was costly.

¶ 17      The defendant advised Thomas that she had recently operated on Max and Chief on the island counter in her kitchen after sterilizing the counter beforehand. The defendant acknowledged, however, that the feces-laden environment in her home was not healthy and was not an acceptable environment in which to perform surgical procedures. She further acknowledged that she would be upset if someone performed surgery on one of her pets in such an environment.

¶ 18      With respect to Shane, the defendant explained that he had lost his left hind foot from pressure necrosis after recently getting it caught in his cage. The defendant stated that she had been treating the injury but that Shane had eaten the bandages she had applied. The defendant explained that Shane had started chewing on the leg after the paw had gotten "leathery" and died. The defendant acknowledged that what remained of the leg needed to be amputated.

¶ 19      With respect to the animal carcasses found in her basement, the defendant indicated that she had been keeping most of them frozen in her deep freezers for years. She further indicated

- 4 -

that the carcasses were those of animals that she had previously owned and that some were 10 years old. The defendant explained that she wanted to have the carcasses cremated so that she could keep the ashes, but she had been unable to save up the money to do so. She further explained that, after the electricity to her house was disconnected, she had considered digging a mass grave on her property so she could bury them there.

¶ 20 The defendant acknowledged that her house was a "disaster" and that the way she was living was not "normal." She insisted, however, that the animals she kept were happy, healthy, and well cared for. Stating that she was not crazy, the defendant explained that she was simply overwhelmed. She further explained that the "vicious cycle" she found herself in had negatively spiraled when her father became ill and then worsened when she lost her electricity. The defendant stated that she had been attempting to "patch up one hole at a time" and had only recently lost control of the situation. The defendant advised Thomas that she was ashamed, worried, and "stressed out of [her] head."

¶ 21 On the morning of Saturday, May 23, 2015, Shane was taken to Dr. Gordon Rhine's animal hospital in Herrin, and Chief was taken to Dr. Allen Hodapp's veterinary clinic in Marion. Max was taken to a veterinary hospital in Carbondale, where he received treatment for an infection at his incision site and was subsequently released.

¶ 22 At trial, Rhine testified that what remained of Shane's left hind leg required amputation and was something that needed to be addressed "pretty soon." Identifying photographs showing the condition of Shane's leg when the dog was removed from the defendant's home, Rhine described Shane's leg wound as a large, granulating wound that extended mid-tibia across the hock. Noting that the metatarsals of the leg were clearly "sticking out," Rhine opined that Shane had apparently sustained a left paw injury that had become severely infected and that the dog had instinctively chewed its foot off as a result. Rhine explained that when a paw becomes infected, a dog will "actually chew it off" and not know "where to stop." Rhine indicated that Shane had "already partially" amputated the left hind leg and that the procedure needed to be "completed." Rhine stated that treating Shane's initial injury with antibiotics, bandaging, and an Elizabethan collar would have prevented it from becoming worse. Rhine testified that Shane had "obviously already been licking the wound for a while."

¶ 23 When presented with photographs depicting the unsanitary conditions inside the defendant's home, Rhine testified that clean conditions were essential to proper veterinary care. Rhine explained that "if something's not clean, it's going to have bacteria[, and] [t]hat bacteria is going to lead to infection, and infection is going to cause all kinds of problems." Rhine further explained that "fecal matter inherently has bacteria in it" and that exposing an open wound to fecal matter is "just asking for trouble." Rhine testified that decomposing animal carcasses are also fraught with bacteria. Rhine opined that housing live animals near decomposing animal carcasses would be unhealthy and inhumane.

¶ 24 Hodapp testified that, when he saw Chief in May 2015, Chief was dehydrated, lethargic, and minimally responsive. Hodapp testified that Chief's history, blood tests, and physical examination indicated that the dog was suffering from peritonitis secondary to surgical contamination. Hodapp explained that peritonitis is an infection of the abdominal cavity caused by a contaminant's direct entry into the abdomen and that, in a surgical setting, contamination can result from inadequate preparation or poor sterilization techniques. Hodapp indicated that, given the condition of the defendant's home, her kitchen's island counter was not a proper place to perform an operation. Hodapp also noted that Chief's abdomen had not been shaved

prior to the operation, which increased the risk that the dog might contract a surgical-site infection.

¶ 25    Hodapp testified that he had advised Snoddy that Chief's prognosis was grave. Hodapp recommended that Chief be aggressively treated with intravenous fluids and antibiotics, but further treatment and diagnostics were declined. Chief died at home less than 24 hours later, and Hodapp opined that peritonitis was the cause of death. Hodapp acknowledged that his opinion had not been confirmed by a paracentesis procedure or a necropsy.

¶ 26    For the defense, Dr. Jeffrey Parton testified that he had reviewed Chief's medical records at the defendant's request. Parton stated that Chief had a history of untreated heartworms and been experiencing premortem breathing problems. Parton opined that the testicular tumor that the defendant removed from Chief was most likely cancerous and that Chief was in poor condition going into the surgery. Parton disagreed with Hodapp's conclusion that Chief died from peritonitis, stating that additional blood tests should have been conducted. Parton testified that a paracentesis procedure or a necropsy should have been also performed to confirm the presence of peritonitis. Parton further opined that, even if Chief had contracted a bacterial infection from the surgery, it was highly unlikely that the infection would have proven fatal in less than 24 hours. Parton acknowledged, however, that it would have been difficult for a dog in Chief's condition to survive a serious infection for very long. Parton further acknowledged that he knew nothing of the conditions under which Chief's operation had been performed.

¶ 27    Erin Cupp testified that the defendant had been her veterinarian since 2005. Cupp described the defendant as an extremely dedicated veterinarian who genuinely loved animals and was always willing to provide them "around-the-clock care." Cupp testified that despite the conditions that existed in the defendant's home in May 2015, she would still have allowed the defendant to treat her pets.

¶ 28    Tom's owner, Paula Most, testified that the defendant had been her veterinarian for nearly 20 years. Most's opinions of the defendant were similar to Cupp's, and Most recalled an occasion when the defendant picked up one of her sick pets during an ice storm when the road conditions were "horrible." Most further recalled that the defendant had once euthanized one of Most's cats on a Sunday so that the animal would not have to suffer until the defendant's clinic opened on Monday. Most indicated that, despite the conditions in which Tom had been found, she would still allow the defendant to treat her pets.

¶ 29    Diane Russell also testified that the defendant had been her veterinarian for nearly 20 years. Russell testified that the defendant was a compassionate veterinarian who had treated her pets in several emergency situations. Referencing the defendant's willingness to take in animals that had been abandoned by their owners, Russell explained that the defendant "could never turn down a dog that needed help" and that the defendant's heart was "too big when it comes to animals." Russell indicated that, as a result, the defendant had ultimately assumed responsibility for more animals than she could handle. Russell further indicated that, despite what occurred at the defendant's house in May 2015, she would still use the defendant as her veterinarian.

¶ 30    Theresa Keith testified that she was a certified medical technologist and had worked as a veterinarian technician at the defendant's clinic in Carbondale from 2000 through 2005. Keith testified that, out of all the veterinarians she had ever known, the defendant was the most caring. Keith testified that the defendant "would go the extra mile" when treating an animal

and often provided services *pro bono*. Keith further testified that, if an animal were in critical condition, the defendant would keep it with her at all times.

¶ 31 Stacey Ballard testified that she worked for the Illinois Department of Agriculture as an animal and animal products investigator and had formerly managed animal shelters for the Humane Society in southern Illinois and southeast Missouri. Ballard testified that she had known the defendant since 1998 and had been to the defendant's clinic many times. Ballard testified that the defendant was a dedicated veterinarian who would "go to extreme[s]" for the animals she treated. Ballard further indicated that, when she managed the Humane Society's animal shelter in Jackson County, the defendant had provided free services for the animals and had adopted several animals herself.

¶ 32 Ballard acknowledged that keeping live pets near decomposing animal carcasses would be unhealthy for the pets. She further acknowledged that she would generally consider a dog found in Shane's condition to be a dog who had been deprived of humane treatment. Ballard suggested that in May 2015 the defendant "had a lot on her plate" both personally and professionally. Ballard testified that she had recused herself from participating in the investigation that occurred at the defendant's house on May 22, 2015, in light of the numerous professional interactions that the two had previously had.

¶ 33 The defendant testified that her financial and personal problems began after her father was diagnosed with lung cancer in the fall of 2014. The defendant testified that, prior to the "raid" on her home, she had been trying to get her situation "under control" and had been without electricity for about two weeks. The defendant indicated that her loss of electricity had made things significantly worse and that coyotes approaching the house at night had become a resulting problem.

¶ 34 The defendant testified that all of the animals found at her house had been provided with proper food and medical care. The defendant indicated that all of the animals had names and that she had adopted most of them because they were going to be euthanized at local shelters. The defendant explained that her indoor animals had taken turns being out of their cages because it would have been dangerous to "let them all run loose at the same time." The defendant explained that it cost $50 a day to feed the animals and that she spent approximately four hours a day cleaning their cages. The defendant indicated that she had been lining the cages with paper towels and throwing the bagged refuse in her yard. The defendant further indicated that the bobcat found in the bedroom was a "temporary situation" and that she had taken the animal in after finding it "near death."

¶ 35 With respect to the animal carcasses found in her basement, the defendant testified that the carcasses that were not inside the deep freezers had come from a deep freezer that she kept in her barn. The defendant explained that, after her electrical service was terminated, she had moved the carcasses from the barn freezer to the basement because the basement was the "coolest spot" she thought would be safe from wild animals. The defendant acknowledged that the environment in the basement was not healthy, and she all but conceded that, given the lack of ventilation, the conditions in the basement were potentially injurious to the animals being housed there.

¶ 36 When asked about Shane, the defendant testified that he had injured his left hind leg by getting it caught in the door of his cage while attempting to escape while she was away one day. The defendant explained that, when she subsequently freed the leg, it was swollen from the compression. The defendant testified that she had treated the injury by massaging the leg

and giving Shane antibiotic and anti-inflammatory medications. The defendant stated that, although the injury had not resulted in an open wound, she had nevertheless feared that she might have to eventually amputate the leg or at least "a couple toes." The defendant testified that she had decided to "ride it out," hope for the best, and monitor the leg's temperature and texture for signs of necrosis. The defendant indicated that, several days later, she noticed that the paw had died and that Shane had chewed off the dead flesh. The defendant further indicated that Shane would not have felt anything because the foot was dead. The defendant noted, however, that the exposed "pink tissue" around Shane's protruding bones indicated that there was still "some blood flow" to the remaining portion of the leg. The defendant testified that she had bandaged the leg but that Shane had eaten the bandages. The defendant explained that she had planned on amputating Shane's leg after performing Chief's surgery, but the situation with Max unexpectedly arose. The defendant testified that, although the leg "looked bad," she did not think that Shane had been mistreated. The defendant testified that Shane's condition had been "stable" and that he had been "running around on three legs."

¶ 37    With respect to Chief, the defendant testified that his testicular tumor had been killing him and that he would have died from it had it not been removed. The defendant stated that she knew Chief's surgery was going to be risky and that she was grateful he had survived it. She explained that Chief's surgery had been "bloody" due to the size of the blood vessels that had been attached to the tumor. She further explained that she had sanitized the island counter where she performed Chief's operation with disinfectant and bleach and had performed the operation using sterile medical supplies. The defendant indicated that she had performed numerous surgeries during her 22 years as a veterinarian and that, other than the unhealthy surroundings and her failure to shave Chief's abdomen, she had performed Chief's surgery in the same manner as she had performed all the others. The defendant testified that she had given Chief antibiotics before and after the operation to prevent infection. The defendant explained that she had performed Chief's surgery because he needed the operation and she needed the money. The defendant testified that she had never cruelly treated an animal in her care and would never intentionally do anything to harm an animal.

¶ 38    During closing arguments, the State maintained, *inter alia*, that Shane had obviously been suffering because the dog had been "eating its own leg." Referencing Rhine's testimony, the State noted that proper treatment of Shane's injury would have entailed the use of an Elizabethan collar to prevent the dog from chewing on the leg. The State argued that, despite what the defendant had "wanted to do for Shane," she had failed to do "what needed to be done for Shane." The State maintained that it had thus proven the defendant's guilt on count VII.

¶ 39    With respect to count I, the State contended that, because the defendant had intentionally operated on Chief in an environment that she knew was unhealthy and unsanitary, she presumptively intended the fatal consequence. The State further suggested that, because the defendant had deliberately chosen to operate on Chief while her license to practice veterinary medicine was suspended, "[t]here was an intent there to do wrong."

¶ 40    In response, the defendant emphasized that, although her kitchen counter was not "the best place in the world" to perform Chief's surgery, she had sanitized the counter beforehand and had operated using sterile surgical supplies. The defendant further emphasized that Chief was "an incredibly sick animal" and that she had removed his tumor because she was trying to save his life. Noting that there was no evidence indicating that she had wanted to seriously injure or kill Chief, the defendant argued that the State had failed to prove beyond a reasonable doubt

that she acted with the specific intent required to sustain a conviction on count I. Referencing Parton's testimony, the defendant further argued that the State had also failed to prove that Chief's surgery had resulted in a bacterial infection that caused the dog's death.

¶ 41 With respect to count VII, the defendant argued that there was no evidence that Shane had actually "suffered due to a serious infection," as the State had alleged in its amended information. The defendant further argued that, although it was undisputed that Shane had "chewed on" his leg, "the dog didn't chew his leg off," as the State had also alleged. The defendant asserted that the State had thus failed to prove its charge pertaining to Shane. The defendant further asserted that she had provided Shane with proper treatment and care after he lost his foot due to compression necrosis.

¶ 42 The trial court ultimately found the defendant guilty on all counts of the State's amended information with the exception of count VI, which the State dismissed midtrial. In September 2016, the court denied the defendant's motion for a new trial and sentenced her to a two-year term of probation. The court additionally ordered her to obtain a mental health evaluation and complete any recommended treatment. See 510 ILCS 70/3(d), 3.02(c) (West 2014). The defendant subsequently filed a timely notice of appeal pursuant to Illinois Supreme Court Rule 606 (eff. Dec. 11, 2014).

¶ 43 ANALYSIS

¶ 44 The defendant argues that the State failed to prove her guilty beyond a reasonable doubt on counts I, VII, VIII, IX, X, XI, and XII of its amended information. The defendant does not challenge her convictions on counts II through V, which alleged instances of practicing veterinary medicine without a license. As previously indicated, count I charged the defendant with aggravated cruelty to a companion animal with respect to Chief, count VII charged her with violating an animal owner's duties with respect to Shane, and counts VIII through XII charged her with violating an animal owner's duties with respect to several "caged" dogs that were physically described but not named.

¶ 45 "The due process clause of the fourteenth amendment to the United States Constitution safeguards an accused from conviction in state court except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime charged." *People v. Brown*, 2013 IL 114196, ¶ 48. When a defendant challenges the sufficiency of the State's evidence on appeal, a reviewing court must view the evidence in the light most favorable to the State and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.* "Under this standard, a reviewing court must allow all reasonable inferences from the record in favor of the prosecution" (*People v. Davison*, 233 Ill. 2d 30, 43 (2009)), and a defendant's conviction will only be reversed where the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt (*People v. Givens*, 237 Ill. 2d 311, 334 (2010)).

¶ 46 Counts VIII, IX, X, XI, and XII

¶ 47 Pursuant to section 3(a)(4) of the Humane Care for Animals Act, animal owners are required to provide their animals "humane care and treatment." 510 ILCS 70/3(a)(4) (West 2014). Although what constitutes "humane care and treatment" is not statutorily defined, when determining whether an animal was deprived of the same, we will presume that "common sense" applies. *People v. Curtis*, 407 Ill. App. 3d 1042, 1049 (2011).

- 9 -

¶ 48     Counts VIII through XII charged the defendant with violating an animal owner's duties with respect to several "caged" dogs that were physically described but not named. At trial, the animals were identified as dogs that had been removed from the defendant's basement, and it was undisputed that the defendant owned the dogs in May 2015. See 510 ILCS 70/2.06 (West 2014) (" 'Owner' means any person who (a) has a right of property in an animal, (b) keeps or harbors an animal, (c) has an animal in his care, or (d) acts as custodian of an animal."). Counts VIII through XII specifically alleged that the defendant knowingly failed to provide humane care and treatment for the dogs by keeping them caged "within her private residence among other animals, surrounded by animal carcasses and feces, without sufficient ventilation or air conditioning." When convicting the defendant on counts VIII through XII, the trial court found that "to one degree or another," all of the dogs had been treated inhumanely, which we believe is the only conclusion that the court could have reached under the circumstances.

¶ 49     The dogs found caged in the defendant's basement were being kept near an estimated "50 to 60 or more" animal carcasses that were in varying stages of decomposition. Although the carcasses were in plastic trash bags and most were in the deep freezers, the electricity to the defendant's home had been off for weeks, and there was testimony that many of the bags outside the freezers were open. There was also testimony that carnivorous beetles had begun "cleaning up" the carcasses in the open bags. The floor in the basement was described as "almost slick [and] slimy from urine [and] feces," and Dr. Rhine observed that many of the dogs' cages contained feces in amounts that were unhealthy and unacceptable. There was testimony that the odors emanating from the defendant's residence could be smelled 30 to 40 feet away from the house, and the air in the basement was described as "[v]ery difficult to breathe." The firefighters who wore hazardous-materials suits when removing the dogs and carcasses used self-contained breathing apparatuses to protect themselves and make the job "easier." An animal control officer who assisted in the removal effort without a breathing apparatus testified that he had to take breaks between his trips to the basement so he could "spend a few minutes outside to kind of clear [his] lungs out." Ballard testified that keeping live pets near decomposing animal carcasses would be unhealthy for the pets. Rhine testified that decomposing animal carcasses are fraught with bacteria and that keeping live animals near decomposing animal carcasses would be unhealthy and inhumane. The defendant acknowledged that the environment in the basement was unhealthy, and she all but conceded that, given the lack of ventilation, the conditions were potentially injurious to the animals who were being housed there.

¶ 50     A finding that an animal was deprived of humane treatment and care can be sustained upon evidence showing that the animal's owner failed to consider the animal's health and well-being as a person of ordinary intelligence would have. See *Curtis*, 407 Ill. App. 3d at 1049. Here, the evidence established that, although the defendant was an experienced veterinarian who should have known better, she ignored what a person of ordinary intelligence would have readily recognized, *i.e.*, that caging dogs in her basement was inhumane given the deplorable conditions. Although when interviewed by Captain Thomas the defendant claimed that the dogs in her basement were happy, healthy, and well cared for, that claim reflected the type of rationalization symptomatic of an animal hoarder. See 510 ILCS 70/2.10(iv) (West 2014) (defining a "[c]ompanion animal hoarder" as one who, *inter alia*, "displays an inability to recognize or understand the nature of or has a reckless disregard for the conditions under which

the companion animals are living and the deleterious impact they have on the companion animals' and owner's health and well-being").

¶ 51     On appeal, the defendant intimates that we should reverse her convictions on counts VIII through XII because the State failed to prove that the identified dogs were in imminent danger and failed to prove that she would not have corrected the conditions in her basement had she been given the opportunity to do so. As the State observes, however, neither of those propositions were elements that it was required to establish to meet its burden of proof.

¶ 52                                    Count VII

¶ 53     Pursuant to section 3(a)(3) of the Humane Care for Animals Act, animal owners are required to provide their animals "veterinary care when needed to prevent suffering." 510 ILCS 70/3(a)(3) (West 2014). Although "suffering" is not statutorily defined, the term's plain and ordinary meaning has been recognized as "experiencing physical pain or emotional distress." *In re Debra B.*, 2016 IL App (5th) 130573, ¶ 38. When determining whether an animal needed veterinary care to avoid experiencing physical pain or emotional distress, we will again presume that common sense applies.

¶ 54     As previously noted, count VII of the State's amended information charged the defendant with violating an animal owner's duty with respect to Shane, another dog she undisputedly owned in May 2015. Count VII specifically alleged that the defendant "knowingly failed to provide veterinarian care as needed to prevent the suffering of 'Shane,' a dog that due to a serious infection, chewed its leg off, exposing its flesh and bone."

¶ 55     On appeal, the defendant argues that her conviction on count VII cannot stand because the State failed to prove that Shane "suffered a serious infection that caused him to chew his leg off." The defendant notes that her testimony that Shane lost his left hind foot to compression necrosis was uncontradicted and that Dr. Rhine could only speculate that an infection had caused the dog to chew on its leg. When rejecting this argument below, the trial court concluded that count VII's use of the phrase "a dog that due to a serious infection, chewed its leg off, exposing its flesh and bone" was used to describe the dog identified as "Shane," as opposed to the "suffering" that the defendant should have prevented with proper veterinary care. The court further concluded that the exact cause of Shane's initial injury was ultimately irrelevant because the essential elements that the State was required to prove were that Shane needed veterinary care to prevent suffering and that the defendant failed to provide such care. We agree with the trial court's reasoning and find that the defendant's argument stems from a tortured reading of count VII. The State did not allege that the defendant failed to prevent Shane from "suffering" a serious infection, and the specific injury or ailment that led to Shane's leg being in the condition that it was in when he was removed from the defendant's home was not something that the State was required to allege or prove. It is well established that where a charging instrument alleges all the essential elements of an offense, "other matters unnecessarily added may be regarded as surplusage." *People v. Collins*, 214 Ill. 2d 206, 219 (2005).

¶ 56     With respect to the State's proof of the charge, when finding the defendant guilty on count VII, the trial court concluded that, through Hodapp's testimony and the photographs showing the condition of Shane's leg when the dog was removed from the defendant's home, the State had proven beyond a reasonable doubt that Shane had needed "some serious veterinary care" that the defendant had failed to provide. Viewed in the light most favorable to the State, the

- 11 -

trial evidence amply supported that finding and further supported the trial court's implicit determination that Shane had suffered while chewing on his leg to the point that the metatarsals were pronouncedly protruding and the surrounding flesh was predominately skinless. Although at trial the defendant suggested that Shane would not have felt anything while chewing off his necrotic foot, Shane's wound extended well beyond the junctions of the bones to which the foot had been attached. Furthermore, the defendant herself noted that the exposed "pink tissue" around the bones indicated that there was still "some blood flow" to the remaining portion of the leg. Although Rhine did not give an estimate as to the wound's age, he testified that it was granulating and that Shane had "obviously already been licking the wound for a while." Under the circumstances, it was reasonable for the trial court to conclude that, even if Shane had been found in "stable" condition as the defendant suggested at trial, as matter of common sense, the dog had suffered at some point while performing what Rhine described as a partial amputation of its own leg. We also note that the defendant again exhibited the type of rationalization symptomatic of an animal hoarder when she suggested that, although Shane's leg "looked bad," he had not been neglected.

¶ 57                                    Count I

¶ 58    In pertinent part, the statute defining the offense of aggravated cruelty to a companion animal states "[n]o person may intentionally commit an act that causes a companion animal to suffer serious injury or death." 510 ILCS 70/3.02(a) (West 2014). A "companion animal" is statutorily defined as "an animal that is commonly considered to be, or is considered by the owner to be, a pet." *Id.* § 2.01a.

¶ 59    The offense of aggravated cruelty to a companion animal is a specific intent crime designed to prevent the intentional killing or injuring of companion animals. *People v. Primbas*, 404 Ill. App. 3d 297, 301 (2010). To prove a commission of the offense, the State must therefore show that the defendant intentionally performed an act that caused a companion animal to suffer serious injury or death and that the defendant did so with the specific intent to kill or seriously injure the animal. *Id.*; *People v. Lee*, 2015 IL App (1st) 132059, ¶ 51. A defendant acts with the intent to accomplish the result described by a statute defining an offense when his or her "conscious objective or purpose is to accomplish that result." 720 ILCS 5/4-4 (West 2014). Because an intent to kill or injure is a state of mind that is generally not proven by direct evidence, such an intent may be inferred from the character of the defendant's acts and the circumstances surrounding their commission. *People v. Terrell*, 132 Ill. 2d 178, 204 (1989).

¶ 60    Count I of the State's amended information alleged that the defendant committed the offense of aggravated cruelty to a companion animal by intentionally performing a surgical operation on Snoddy's pet dog, Chief, "in an unsterile manner at her private residence, thereby committing an act that caused [Chief's] death." When finding the defendant guilty on count I, the trial court concluded that the surgery that the defendant performed on Chief was the cause of his death and that the "intent element" of the offense had been proven because the defendant "had to know" that operating on Chief in an unsterile manner "was going to harm him." When denying the defendant's motion for a new trial, the court similarly stated that the defendant had acted with the requisite intent because "[s]he had to know when she proceeded in that manner in that place that she was harming him, and the outcome could not be good."

¶ 61    On appeal, the defendant advances multiple arguments in support of her contention that her conviction on count I should be reversed, several of which are directed at the trial court's

finding that Chief's death resulted from the surgery she performed. The only argument we need address, however, is the defendant's claim that the State failed to prove that she performed the surgery with the requisite intent.

¶ 62    In the present case, none of the evidence adduced at trial supported an inference that the defendant's conscious purpose or objective was to kill or seriously injure Chief when she operated on him in an unsterile manner. It was rather undisputed that the defendant had been Chief's veterinarian since he was a pup, that she performed Chief's surgery because he needed a testicular tumor removed, and that she loved animals to a fault and would never intentionally harm one. We note that the State has never maintained that the defendant deliberately contaminated Chief's incision site and that the defendant's conduct before, during, and after the operation was inconsistent with an intent to injure or kill. See *People v. Mitchell*, 105 Ill. 2d 1, 9-10 (1984). Viewing the trial evidence in the light most favorable to the State, as a trained veterinarian, the defendant clearly acted recklessly (see 720 ILCS 5/4-6 (West 2014) ("A person is reckless or acts recklessly when that person consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, described by the statute defining the offense, and that disregard constitutes a gross deviation from the standard of care that a reasonable person would exercise in the situation.")) and perhaps acted knowingly, as the trial court suggested (see *id.* § 4-5(b) ("A person knows, or acts knowingly or with knowledge of *** [t]he result of his or her conduct, described by the statute defining the offense, when he or she is consciously aware that that result is practically certain to be caused by his conduct.")). Evidence that a defendant acted knowingly with respect to a lethal result is insufficient, however, to show that the defendant acted with the specific intent that the result actually occur. See *People v. Tamayo*, 73 Ill. 2d 304, 310 (1978); *People v. Trinkle*, 68 Ill. 2d 198, 202 (1977).

¶ 63    On appeal, the State intimates that we should affirm the defendant's conviction on count I by applying the rule of "presumed malice and intent." *People v. Marrow*, 403 Ill. 69, 74 (1949). Pursuant to that rule, a defendant is presumed to intend the natural and probable consequences of his or her acts, and evidence that the defendant committed a voluntary and willful act which has the natural tendency to cause death or great bodily harm is sufficient to prove an intent to kill. *Terrell*, 132 Ill. 2d at 204; *Marrow*, 403 Ill. at 74; see also *People v. Glazier*, 2015 IL App (5th) 120401, ¶¶ 15-16; *People v. Medrano*, 271 Ill. App. 3d 97, 103-04 (1995). "For example, when a defendant intentionally uses a deadly weapon upon the victim, it may properly be inferred that he intended to cause the death of the victim." *Terrell*, 132 Ill. 2d at 204; see also *Primbas*, 404 Ill. App. 3d at 302-03 (holding that the circumstances surrounding the defendant's act of fatally shooting a relative's pet dog with a pellet gun was sufficient to sustain a finding that the defendant acted with the specific intent to kill or injure the dog despite his claim that he shot "merely to shoo away what he believed was a feral animal"). The doctrine of presumed malice and intent is not a substantive rule of law, however, and cannot be applied reflexively. See *People v. Bell*, 113 Ill. App. 3d 588, 594 (1983) (noting that, if applied indiscriminately, the rule " 'would in effect destroy the concept of intention and replace it entirely with negligence' " (quoting Wayne R. LaFave & Austin W. Scott, Handbook on Criminal Law § 28, at 203 (1972))). Our supreme court has long recognized that the rule is only applicable where the character of a defendant's act and the "absence of qualifying facts" lead to the "natural and irresistible conclusion" that the destruction of life was intended. *People v. Coolidge*, 26 Ill. 2d 533, 537 (1963); *People v. Simmons*, 399 Ill. 572, 578 (1948); *Weaver*

*v. People*, 132 Ill. 536, 541 (1890); see also *People v. Williams*, 165 Ill. 2d 51, 64 (1995); *People v. Salazar*, 126 Ill. 2d 424, 450 (1988). In other words, the rule is only applicable where the facts of a case justify its application. *Bell*, 113 Ill. App. 3d at 594.

¶ 64        Here, the facts do not justify the application of the rule of presumed malice and intent. The defendant's scalpel was not employed as a deadly weapon (see *People v. Blanks*, 361 Ill. App. 3d 400, 411 (2005)), and as previously noted, none of the evidence adduced at trial supported an inference that the defendant's conscious purpose or objective was to kill or seriously injure Chief when she operated on him in an unsterile manner. We further note that, although the trial court suggested that the "intent element" of count I had been proven because the defendant had acted knowingly, the court declined the State's invitation to find that the defendant presumptively intended the fatal consequence of Chief's operation. On appeal, the State cites *People v. Robards*, 2018 IL App (3d) 150832, in support of its contention that we should affirm the defendant's conviction on count I, but the present case is readily distinguishable.

¶ 65        In *Robards*, the defendant was convicted on charges of aggravated cruelty to a companion animal after she "abandoned her dogs and left them alone to die." *Id.* ¶ 19. The evidence in *Robards* established that, when the defendant moved out of a house that she was renting, she left her two pet dogs inside with no access to food or water. *Id.* ¶¶ 4-5, 15. After several months, during which the defendant told the owner of the house that the dogs were being cared for on a daily basis, the dogs were found dead from starvation and dehydration. *Id.* ¶¶ 4-6, 15. On appeal, when rejecting the defendant's claim that the State had failed to prove that she had acted with the specific intent that the dogs perish or suffer serious injury, the *Robards* court noted that "[t]he natural consequence of not feeding or providing water to pets is that they will die." *Id.* ¶ 15. The court thus held that, "[a]s a person intends 'the natural and probable consequences of his acts' [citation], it follows that the defendant had the requisite intent necessary to be found guilty of aggravated cruelty to a companion animal." *Id.*

¶ 66        The facts in *Robards* justified the application of the rule of presumed malice and intent because the defendant's intentional failure to feed or water her dogs for several months and the absence of qualifying facts led to the natural and irresistible conclusion that the destruction of the dogs' lives was intended. Again, however, the facts in the present case do not justify the application of the rule. We also note that, unlike the present case, *Robards* addressed a situation where the defendant's specific intent could be inferred from a course of conduct occurring over an extended period of time. See also *People v. Banks*, 161 Ill. 2d 119, 132-35 (1994) (holding that, where the defendant's deliberate conduct over an extended period of time included exposing the infant victim to subfreezing temperatures and preventing the child from receiving adequate nourishment, the evidence was sufficient to sustain a finding that the defendant intended to kill the child, who ultimately died from starvation and hypothermia); *People v. Koshiol*, 45 Ill. 2d 573, 575, 578 (1970) (holding that the defendant's specific intent to kill her husband was established by evidence that she had been feeding him arsenic for several months and had attempted to feed him additional doses while he was hospitalized for chronic arsenic intoxication), *overruled on other grounds by People v. Nunn*, 55 Ill. 2d 344 (1973); *People v. Lee*, 2015 IL App (1st) 132059, ¶¶ 52-63 (holding that a rational juror could have concluded that the defendant intended to seriously injure or cause the death of horses that were stabled on his property by finding that he knew that the horses were being kept in deplorable conditions without sufficient food and water yet consciously allowed the situation to continue for over a year); *People v. Land*, 2011 IL App (1st) 101048, ¶ 102 (holding that the jury could have found

that the defendant acted with the specific intent to cause serious injury to her dog where the evidence established that she was aware that the dog's heavy chain had broken through the dog's skin yet took no action "during the four to six weeks it took for the chain to become seriously embedded in the dog's neck").

¶ 67 "Reasonable doubt exists as a matter of law when the State fails to prove an essential element of the offense." *People v. Fountain*, 2011 IL App (1st) 083459-B, ¶ 13. Here, the State failed to prove beyond a reasonable doubt that the defendant acted with the specific intent to cause Chief serious injury or death, and we accordingly reverse her conviction on count I.

¶ 68                                    CONCLUSION

¶ 69 For the foregoing reasons, we hereby reverse the defendant's conviction on count I of the State's amended information and affirm her convictions on the remaining counts upon which she was found guilty.

¶ 70 Affirmed in part and reversed in part.

¶ 71 JUSTICE CATES, concurring in part and dissenting in part:

¶ 72 The acts that gave rise to the charges in this case occurred in June 2015. The State issued its amended indictment in May 2016. Defendant was found guilty on all counts after a three-day bench trial in July 2016. Defendant subsequently filed a posttrial motion, which was denied by the trial court in September 2016.

¶ 73 Now, almost four years later, this court is presented with the initial appeal of the defendant's judgment of conviction. Although I understand the long-standing staffing issues faced by our appellate defenders, the delay in bringing appeals before this court on a timely basis is of great concern, as it impacts access to justice. Recently, the Illinois Judicial Conference issued a three-year strategic agenda designed "to protect the rights and liberties of all."[1] While altruistic in its goals, the plan does not specifically address the significant backlog of cases in the criminal justice system, despite the critical need to do so.[2] As a court of review, it is our responsibility to see that appellate cases, both criminal and civil, are presented to this court for review in a timely manner.

¶ 74 That said, I concur in that portion of the opinion that affirms defendant's convictions on counts VII, VIII, IX, X, XI, and XII. I disagree, however, with the reasoning of the majority regarding count I and would affirm the trial court's conviction on that count. As noted by the majority and set forth in *Primbas*, "[w]hen a court reviews a challenge to the sufficiency of the evidence, the relevant question is whether, after viewing the evidence in a light most favorable to the State, any rational trier of fact could have found the essential elements of the crime

---

[1] Ill. Judicial Branch Strategic Agenda 2019-2022, https://courts.illinois.gov/SupremeCourt/Jud_Conf/IJC_Strategic_Agenda.pdf (last visited Apr. 7, 2020) [https://perma.cc/7FQA-UJ6K].

[2] A six-month pilot program, using volunteer *pro bono* attorneys, to help reduce the backlog of criminal appeals is being implemented and tested in the First and Second Districts of the Appellate Court. If favorable results are found, then it may be expanded to our other appellate districts. Laura Bagby, *Illinois Supreme Court Launches* Pro Bono *Pilot to Address Criminal Appeals Backlog*, 2 Civility (Feb. 20, 2020), https://www.2civility.org/illinois-supreme-court-launches-pro-bono-pilot-to-address-criminal-appeals-backlog/ [https://perma.cc/8T95-7AXE].

beyond a reasonable doubt." 404 Ill. App. 3d at 302. The reviewing court is not allowed to substitute its judgment for that of the trier of fact on questions involving the weight of the evidence, the credibility of the witnesses, or conflicts in the testimony. *Id.* Those are matters for the trial court.

¶ 75 Nevertheless, in reversing the defendant's conviction as to count I, the majority seems to have substituted its judgment for that of the trial judge on matters of credibility and weight of the evidence. In my view, there is ample evidence, albeit circumstantial, to support the trial court's finding that the "intent" element of the offense of aggravated cruelty to a companion animal was satisfied when the defendant had to know that performing the surgical removal of Chief's tumor would cause the dog harm.

¶ 76 The actions of the defendant prior to performing the surgical procedure on Chief must be considered in addition to the overwhelming evidence regarding defendant's actions at the time of the procedure. Defendant admitted that she was performing veterinarian services in a home environment that was cluttered with dead animal carcasses, covered in animal feces, and without sufficient ventilation or air conditioning. The testimony revealed that the smell was so offensive to a process server who had been to the defendant's home that a call was placed to the Williamson County Sheriff's Office. The process server reported that "a strong odor of death" was emanating from the home and that no one was answering the door. Dogs were also heard barking inside. Even the defendant acknowledged during her interview that the feces-laden environment was not healthy.

¶ 77 It is of no matter that Chief's owner voluntarily brought Chief to defendant or that defendant loved animals and was trying to help Chief because his testicular tumor was going to cause his death. Regardless of which expert the trial court believed, the testimony was clear that Chief was in very poor physical condition at the time the defendant decided to perform the testicular tumor surgery on her kitchen counter. Even the defendant was not sure that Chief would survive the surgery. Based on this evidence, the trial court could have reasonably found beyond a reasonable doubt that the performance of the surgery, in completely unsterile conditions, constituted the intentional act that caused Chief's hastened demise.

¶ 78 In light of the foregoing, I would affirm the defendant's conviction on count I of the State's amended information. Therefore, I respectfully dissent.