2021 IL App (1st) 182583

FIRST DISTRICT
SIXTH DIVISION
December 10, 2021

No. 1-18-2583

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 185004081 |
| | ) | |
| DAVID JANOSEK, | ) | Honorable |
| | ) | Matthew J. Carmody, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE HARRIS delivered the judgment of the court, with opinion.
Presiding Justice Pierce and Justice Oden Johnson concurred in the judgment and opinion.

## OPINION

¶ 1    Following a bench trial, defendant David Janosek was convicted of aggravated assault and resisting a peace officer and sentenced to one year of conditional discharge with fines and fees. On appeal, he contends that the search of his backyard was improper, the charge of aggravated assault was fatally defective, the evidence was insufficient to convict him beyond a reasonable doubt, and trial counsel rendered ineffective assistance. For the reasons stated below, we affirm.

¶ 2                              I. JURISDICTION

¶ 3    On October 2, 2018, the trial court found defendant guilty of aggravated assault and one count of resisting a peace officer and sentenced him to conditional discharge with fines and fees. Defendant filed a posttrial motion on October 22, 2018; the court denied it on November 13, 2018; and defendant filed his notice of appeal on December 11, 2018. Accordingly, this court has jurisdiction pursuant to article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI,

§ 6) and Illinois Supreme Court Rule 603 (eff. Feb. 6, 2013) and Rule 606 (eff. Mar. 12, 2021) governing appeals from a final judgment of conviction in a criminal case.

¶ 4                                    II. BACKGROUND

¶ 5      Defendant was charged by complaint with one count of aggravated assault and two counts of resisting a peace officer, all allegedly committed at a specified address in Cook County on or about May 25, 2018. Count I cited section 12-2(c)(1) of the Criminal Code of 2012 (Code) (720 ILCS 5/12-2(c)(1) (West 2018)) and alleged that defendant committed aggravated assault when he "picked up a black in color holster, which contained a black/gold in color Winchester, model 11, .177 cal, Co2 BB gun, and pointed it in the direction of [Officer Peter] Lenos *** while the gun was still contained in the holster, and then attempted to take the gun out of the holster." Counts II and III cited section 31-1(a) of the Code (*id.* § 31-1(a)) and alleged that defendant committed the offense of resisting a peace officer when he "knowingly resisted the performance of *** an authorized act within his official capacity, being the arrest of" defendant by Lenos and Corporal Daniel Dabros respectively, knowing each "to be a peace officer engaged in the execution of his official duties, in that he refused to place his hands/arms behind his back and attempted to defeat the arrest by tensing up and pulling his arms away from" Lenos and Dabros respectively.

¶ 6      At trial, Dabros testified that he was an on-duty police officer, in uniform and driving a marked police car, at about 1:15 p.m.[1] on May 25, 2018, when he received a report to go to a certain address about "a BB gun complaint." At that address, he found a home with a woman in the driveway. After speaking with her, Dabros went through her backyard "towards the house

---

[1]Dabros did not testify whether the incident was at 1:15 a.m. or 1:15 p.m., but video of the incident, referenced further below, shows that it occurred in the daytime.

where she said the complaint was coming from," which was "the property *** [d]irectly behind her residence." As he went toward her backyard, he heard popping from a BB gun or small-caliber firearm. He believed it to be from a BB gun because he had previously answered a call to the same home. When he turned toward the popping noise, he saw and heard a window closing in the house about 20 yards away. By then, he was in defendant's backyard. "I don't know if it was on his actual backyard, but it was behind his house in a tree line." Dabros saw Lenos nearby in defendant's driveway, with his Taser drawn and apparently looking for the source of the popping sound.

¶ 7    After hearing the window close, Dabros heard Lenos say "Put it down" and saw defendant exiting the house, with a black and gold object in his hand that Dabros believed to be a gun, and walking towards Lenos. Lenos then approached defendant in an attempt to take him into custody. When Lenos told defendant that he was under arrest and to put his hands behind his back, "he kept pulling away" and would not comply. Dabros joined Lenos in trying to put handcuffs on defendant, standing right next to defendant and telling him to stop resisting. Defendant kept resisting and said that they needed either a warrant or an ambulance. Dabros put a handcuff on defendant's left wrist while Lenos handcuffed his other wrist. Dabros and Lenos then tried to put defendant into a police car, but he refused and asked for an ambulance. An ambulance was ordered for defendant, and he was put inside and taken to the hospital. He later "end[ed] up back at the police department" where he was charged with aggravated assault, two counts of resisting arrest, and an ordinance violation for the BB gun. Dabros had recovered the BB gun in a holster from "the ground in the backyard." When he first saw the BB gun as he approached defendant's home, it was holstered.

¶ 8    On cross-examination, Dabros testified that the address he responded to was defendant's neighbor's home but that defendant was on his own property when Lenos and Dabros arrested him.

Dabros entered defendant's backyard by passing through a tree line. When defendant exited his house into his backyard, he was about 20 yards from Dabros. Neither Lenos nor Dabros announced that they were police officers. Defendant put down the BB gun when told to, and Dabros never saw it out of the holster and "could not say for sure that he aimed it directly towards any officers." Dabros could not recall whether Lenos told defendant to put his hands behind his back before Lenos made physical contact with him, and he did not recall Lenos telling him to put his hands on his head. While on the ground, defendant said that he had just had surgery and still had stitches and a patch on his side, but Dabros did not recall him saying that the officers were hurting him or "going to give me a heart attack." After defendant was arrested, he requested an ambulance. When asked if defendant was injured, Dabros answered that defendant "wasn't complaining of anything specific," and he denied that defendant's face was discolored.

¶ 9    On redirect examination, Dabros testified that he heard a popping noise as he entered defendant's backyard through the tree line.

¶ 10    Lenos testified that he was an on-duty police officer, in uniform and driving a marked police car, on May 25, 2018, when he went to a certain address.[2] He waited on the neighboring property while Dabros "went to the complainant's house [and] was going to come through the backyard. He wanted me to wait for him so I can go to the backyard from" defendant's front yard. Lenos did not hear anything at first but then, as he and Dabros approached defendant's backyard, heard a loud popping or snapping noise he believed to be from a BB gun or a "low-caliber firearm." He had heard both sounds "[n]umerous times" previously. Lenos could not see Dabros but was in radio communication with him, and Dabros told him that the noise "sounded like it came from

---

[2]He identified the same address referenced in Dabros's testimony.

inside of the house" and that Dabros had seen the basement window closing. Lenos was on defendant's driveway at that point and "peeking" into his backyard. Lenos was in a straight line with defendant's basement door when he exited his house by the basement door into his backyard. His hands were empty as he approached Lenos, as Lenos had told him to do.

¶ 11    However, about 30 to 40 feet from Lenos, defendant bent down and picked up from the ground a holster holding "what appeared to be a semi-automatic handgun." Defendant took "a shooter stance," raising "the holster up at" Lenos, and "attempted to take the firearm out of the holster." Lenos "took cover behind the wall even more" and told defendant to put the gun down. He then "took a chance of it being a BB gun" and told defendant that he would tase defendant if defendant shot him with the BB gun. Defendant then put the holster back on the ground. Lenos approached defendant to detain him, telling him to put his hands behind his back. However, he "pulled his arms away and attempted to defeat the arrest." By then, Dabros was assisting Lenos in trying to get his hands behind his back, with Lenos holding his left hand. "Eventually we took [him] to the ground" and told him he was under arrest but "he advised us that he wasn't" and did not comply with their orders by "giv[ing] us his hands." Only after Lenos twice threatened to tase defendant did he "g[i]ve us his hands so we could complete the arrest." Lenos cut his finger while arresting defendant, although he was unsure how it happened. Lenos was uncertain whether he had ever announced that he was a police officer.

¶ 12    On cross-examination, Lenos testified that he was on defendant's driveway in response to a call and did not see defendant in his backyard. When defendant picked up the holstered object, Lenos believed it to be a semiautomatic pistol based on the handle, which was the only portion he could see due to the holster. Defendant was holding the weapon by its handle, not the holster. He

took a shooter stance, held the weapon with both hands, and tried to remove it from the holster. Lenos did not "a hundred percent" know the weapon to be a BB gun but believed it to be one due to "past incidents we have had with him." When defendant started to draw the weapon, Lenos told him that he would tase him, and defendant then dropped the weapon as ordered. Lenos had drawn his taser already. He approached defendant and made physical contact with him, intending "to take him down," immediately after he dropped the weapon. Lenos reiterated that he told defendant to put his hands behind his back, was unsure whether he told defendant to put his hands on his head, and believed he told him to get on the ground. Defendant said at the time that he had just had surgery and had stitches on his side. Lenos may have received his cut finger from placing his hands on defendant's face, which he did "to apply a pressure point ***[b]ehind his ear." Lenos did not believe that defendant tried to bite him. The BB gun was recovered and inventoried.

¶ 13    The parties stipulated to photographs of a BB gun in a holster as depicting the weapon from this incident. They also stipulated to body camera video from Lenos and Dabros.

¶ 14    The video from Lenos shows him walking down defendant's driveway into the back of his property, standing near a back corner of his house, when a loud popping or snapping noise is heard and Lenos asks "where's he at." A few seconds later, defendant comes out the basement door and up into the backyard. Lenos says "Hey, what are you doing? Get over here." Defendant then steps back a step or two and picks up a black object from the ground near the basement steps. Lenos tells defendant "Put it down now. I get shot with that BB gun, I'm going to tase you, put it down," points his Taser towards defendant, and ducks behind the corner of the building so that defendant is momentarily out of camera view. As Lenos comes out from behind the wall, defendant is placing the object on the ground. Lenos tells him to put his hands in the air, walks towards him, and then

tells him to put his hands behind his back. The video then shows some indistinct flailing or movement, followed by Lenos having a hold of defendant's left wrist, followed by more indistinct flailing or movement, then defendant lying on the lawn with Lenos and Dabros over him. During this time, the audio is less than clear, but defendant can be heard saying "no warrant," "disabled veteran. You need an ambulance," and, when Lenos says again to put his hands behind his back, "No, I just had surgery." When the picture is clear again and Lenos and Dabros are over defendant, defendant is repeatedly told to lie on his stomach, and Lenos has one hand on his right wrist and the other applying pressure behind his left ear. Defendant tells the officers that they "can't do this" because "I have a court order that I can practice shooting my gun in my backyard. Do you understand I just had surgery?" There is further flailing or movement on the ground, and when Dabros tells defendant to get on his stomach, defendant says he had stitches in his side that they were going to break. Defendant tries to raise one of his arms, but Lenos pushes it down to the ground. Defendant says "you need an ambulance to take me." As defendant reiterates that he is a disabled veteran, Dabros completes handcuffing him. After defendant is subdued, he says that he had a BB gun, and Dabros replies "How are we supposed to know that?" Dabros tells another officer who arrived at the scene that the complainant said that defendant had been shooting a BB gun in his backyard while she was having a pool party on an adjoining property. Lenos's video shows Dabros wearing a dark, short-sleeved uniform with a badge visible on the chest, a police patch on one shoulder, and two rank chevrons on each sleeve.

¶ 15    The video from Dabros shows him arriving at a house and speaking with a woman, who tells him that defendant was just outside and she has "it on video." She asks Dabros if "you're the same guy," which he confirms, and says that she heard BB shots. Dabros then walks through a

backyard through a line of trees into another backyard. He stays in the trees behind defendant's yard until a few seconds after a loud snap is heard, when Lenos is heard yelling "Put it down, now!" Dabros then walks through defendant's backyard to where Lenos is trying to handcuff defendant. The video then shows indistinct flailing or movement as someone tells defendant to put his hands behind his back, followed by defendant on his back as Lenos tries to handcuff him. Lenos can be seen on Dabros's video wearing a dark, short-sleeved uniform with a badge visible on his chest, a police patch on his shoulder, and POLICE across the back.

¶ 16    The defense motion for a directed finding was denied, and defendant elected to not testify. During closing arguments, the defense argued in part that "[t]here was no testimony about Officer Lenos being in fear of receiving a battery."

¶ 17    The court found defendant guilty of aggravated assault and resisting a peace officer under count II regarding Lenos, finding him not guilty of resisting a peace officer under count III regarding Dabros. The court found that the video was clear. The officers were "responding to a complaint from a neighbor that somebody is shooting a weapon." In their investigation, one officer "goes to the home that's reportedly where the offender firing the weapon is located," which the court found to be reasonable. When defendant exited his home, "it would be clear to anyone that [Lenos] is a law enforcement officer," but defendant "places his hands on the weapon" and had it in his hands for about five seconds. He put both hands on the weapon and took "a stance towards the officers *** that this court cannot conclude is anything other than a potential firing of a weapon." Even though the weapon was still holstered, the officers did not "have to wait or decide 'Oh, it's a holster. He's not going to fire a bullet at me, or a BB at me.' " Thus, defendant had

committed an aggravated assault before he put the weapon down. The court found that Lenos took cover in reasonable apprehension of a battery. As to resisting arrest, the court found that,

> "had the defendant simply submitted to the handcuffing, there would be no question he did not resist. And even if he didn't submit to the handcuffing at the initial request, the Court wouldn't conclude that he resisted arrest. But we have a defendant here who is more concerned about verbally telling the officers about all of his injuries and his status."

As to the charge of resisting Dabros's arrest, the court found "this was a single act *** with this officer assisting in the arrest that Officer Lenos was attempting to perform" and thus not a separate offense from resisting arrest by Lenos.

¶ 18 Following a sentencing hearing, the court sentenced defendant to one year of conditional discharge, concurrent on both offenses, with fines and fees. The court ordered that defendant surrender his Firearm Owner's Identification card, concealed-carry permit, and any firearms "including BB guns" within seven days. The court also ordered that the police hold the surrendered materials and return them to defendant on October 1, 2019, unless the court ordered otherwise.

¶ 19 Defendant's posttrial motion claimed that the trial evidence was insufficient to convict beyond a reasonable doubt, including that Lenos did not testify to being in apprehension of a battery and was aware that defendant had a BB gun rather than a firearm and that defendant was "physically incapable" of following Lenos's commands due to "age, disability, and recent surgery." The written motion did not challenge the complaint, the officers' entry onto defendant's property, or the absence of a motion to suppress.

¶ 20 During argument on the motion, the defense added an argument that the police had no right to be on defendant's property because "the State did not show that the BB gun was fired in any way" and defendant was not outside when the police arrived. The court denied the posttrial motion.

¶ 21                                       III. ANALYSIS

¶ 22 On appeal, defendant contends that the search of his backyard was improper, the charge of aggravated assault was fatally defective, the trial evidence was insufficient to convict him beyond a reasonable doubt, and trial counsel rendered ineffective assistance. As defendant's claims of ineffectiveness are that counsel should have filed a motion to suppress evidence and a motion to dismiss the aggravated assault charge, we shall consider each with the related contention.

¶ 23 A defendant claiming ineffective assistance must show that counsel's performance was deficient and resulted in prejudice. *People v. Jackson*, 2020 IL 124112, ¶ 90. For prejudice, a defendant must show a reasonable probability that the result would have been different had the deficiency not occurred. *Id.* A defendant must show actual prejudice rather than merely speculating that he or she might have been prejudiced. *People v. Bustos*, 2020 IL App (2d) 170497, ¶ 87.

¶ 24 Matters of trial strategy are typically immune from claims of ineffective assistance unless the strategy was unsound. *Id.* ¶ 89. This court must be highly deferential to trial counsel on matters of trial strategy, not applying hindsight but evaluating counsel's performance from his or her perspective at the time. *Id.*

¶ 25                                  A. Search of Backyard

¶ 26 Defendant contends that a search of his backyard was improper, as police needed to have a warrant to search the curtilage of his home but were on his driveway and in his backyard without a warrant. He also contends that trial counsel was ineffective for not filing a motion to suppress.

¶ 27    As a threshold matter, defendant did not file a pretrial motion to suppress evidence or quash his arrest, so that he forfeited such a claim. *Jackson*, 2020 IL 124112, ¶ 81. This court will consider a forfeited or unpreserved error if it is plain error, that is, if a clear or obvious error occurred and (1) the evidence was so closely balanced that the error alone threatened to tip the scales of justice or (2) the error was so serious that it alone affected the fairness of the proceedings. *Id.* In considering a claim of plain error, we may first determine whether reversible error occurred. *Id.* Moreover, defendant also contends that counsel was ineffective for not filing a motion to suppress.

¶ 28    The decision to file a motion to suppress is generally a matter of trial strategy entitled to great deference. *People v. Gayden*, 2020 IL 123505, ¶ 28. To establish ineffective assistance based on counsel's failure to file such a motion, a defendant must show both that the unargued motion was meritorious and that a reasonable probability exists that the trial outcome would have been different had the evidence been suppressed. *Id.* Where the record does not contain sufficient information concerning the circumstances of the defendant's arrest to determine whether a motion to suppress would have been meritorious or whether defendant was prejudiced, we cannot consider the claim. *Id.* ¶ 29. "[T]he record will frequently be incomplete or inadequate to evaluate that claim because the record was not created for that purpose." *People v. Henderson*, 2013 IL 114040, ¶ 22. "Defendant claims that the facts were fully developed at trial. While this may be true concerning the specific charge against defendant, this is not true with regard to the circumstances leading up to and surrounding defendant's arrest." *Gayden*, 2020 IL 123505, ¶ 30.

¶ 29    Here, the record is inadequate to determine whether the officers' presence on defendant's property was improper or whether trial counsel was ineffective for not filing a motion to suppress. It was touched upon at trial that the complainant provided information to the police and that there

was a prior incident between police and defendant. These matters were only touched upon rather than explored because they were irrelevant to the issues *at trial*. However, both matters would be relevant *on a motion to suppress* to determining the propriety of entering defendant's backyard under the circumstances. Not having those matters explored deprives us of a complete picture of those circumstances. Also, not filing a motion to suppress deprived the State of the ability to call the complainant as a witness because there was no need of her testimony for the issues at trial. In sum, this case illustrates why this court cannot consider a claim based on a trial record developed for a different purpose than a suppression motion.

¶ 30                      B. Aggravated Assault Charge

¶ 31    Defendant contends that the charge of aggravated assault was fatally defective and also contends that trial counsel was ineffective for not filing a motion to dismiss that charge.

¶ 32    Under section 12-2(c)(1) of the Code, a "person commits aggravated assault when, in committing an assault, he or she does any of the following: (1) [u]ses a deadly weapon, an air rifle as defined in Section 24.8-0.1 of this Act, or any device manufactured and designed to be substantially similar in appearance to a firearm, other than by discharging a firearm." 720 ILCS 5/12-2(c)(1) (West 2018). In turn, a "person commits an assault when, without lawful authority, he or she knowingly engages in conduct which places another in reasonable apprehension of receiving a battery." *Id.* § 12-1(a).

¶ 33    A criminal charge must be in writing and must allege the name of the offense, cite the relevant statute, set "forth the nature and elements of the offense charged," identify the date and county of the offense, and name the accused person. 725 ILCS 5/111-3(a) (West 2018). This statute

implements a defendant's "fundamental right to be informed of the nature and cause of criminal accusations made against him" or her. *People v. Carey*, 2018 IL 121371, ¶ 20.

¶ 34    However, whether a violation of section 111-3 results in reversal of a conviction depends on when the defendant first challenged the charge. *Id.* ¶ 21. When the challenge was raised before trial, the charge must strictly comply with section 111-3 and must be dismissed otherwise. *Id.* When a charge was challenged for the first time on appeal, the resulting conviction is reversed only if the defendant shows that he was prejudiced in the preparation of his or her defense. *Id.* ¶ 22. The same prejudice standard applies to a challenge raised for the first time during trial or in a posttrial motion. *People v. Rowell*, 229 Ill. 2d 82, 93-94 (2008). Under the prejudice standard, it is sufficient if the charge apprised the defendant of the precise offense charged with sufficient specificity to (1) prepare his or her defense and (2) allow him or her to plead a resulting conviction as a bar to any future prosecution arising from the same conduct. *Carey*, 2018 IL 121371, ¶ 22. In making this determination, we may resort to the record; that is, the issue before us is whether, in light of the facts of record, the charging instrument was so imprecise as to prejudice the defendant's ability to prepare a defense. *Id.*

¶ 35    Here, defendant contends that count I of the complaint is fatally defective because it did not include the words or phrases "in committing an assault," "uses," or "a deadly weapon, an air rifle as defined in Section 24.8-0.1 of this Act, or any device manufactured and designed to be substantially similar in appearance to a firearm, other than by discharging a firearm." Nor, he contends, were the elements of assault alleged: that defendant without lawful authority knowingly engaged in conduct that placed another in reasonable apprehension of receiving a battery.

¶ 36    However, defendant raised no challenge to the complaint before trial or indeed at any time in the trial court. Therefore, we may reverse only if, in light of the facts on the record, he was prejudiced in his ability to raise a defense. He was not. He was apprised of the date and location of his alleged offense and that he was accused of aggravated assault under section 12-2(c)(1). Most importantly, he was apprised of the particular acts he allegedly committed in violation of that statute: picking up a BB gun, pointing it toward Lenos, and attempting to take it out of its holster. He was also apprised that he was not being accused of using "a deadly weapon" or "an air rifle" but, by the complaint's reference to a BB gun, a "device manufactured and designed to be substantially similar in appearance to a firearm." 720 ILCS 5/12-2(c)(1) (West 2018). The statute cited in the complaint would have apprised the defense of the other elements of the offense charged. Certainly trial counsel was aware of the element of reasonable apprehension of a battery, despite it not being mentioned in the complaint, as he argued its alleged absence at trial.

¶ 37    As to whether counsel was ineffective for not filing a motion to dismiss count I, we note that a charge dismissed before trial may be refiled. 725 ILCS 5/114-1(a)(8), (e) (West 2018). Therefore, had trial counsel filed such a pretrial motion and it succeeded, the State could have refiled the aggravated assault charge with any flaws remedied. We need not raise to actual prejudice the remote prospect that the State would not have done so. Had counsel raised such a challenge at trial as defendant posits, it would have been subject to the same prejudice analysis that we have concluded does not avail defendant. Lastly, defendant faced the same Class A misdemeanor sentencing range for aggravated assault and resisting a peace officer (see 720 ILCS 5/12-2(c)(1), (d); 31-1(a) (West 2018)), and the trial court sentenced him to the same term of conditional discharge, fines and fees, and firearm-related conditions for both offenses. Thus, his

criminal liability would not have been reduced by a motion to dismiss as he claims. We conclude that defendant was not prejudiced by counsel not filing a dismissal motion as to count I.

¶ 38                                    C. Sufficiency of the Evidence

¶ 39     Lastly, defendant contends that the evidence was insufficient to convict him of either offense beyond a reasonable doubt.

¶ 40     As stated above, a person commits the offense of aggravated assault when, in committing an assault—that is, knowingly engaging in conduct that places another in reasonable apprehension of receiving a battery—he or she uses "any device manufactured and designed to be substantially similar in appearance to a firearm, other than by discharging a firearm." *Id.* § 12-2(c)(1). A person commits the offense of resisting a peace officer when he or she "knowingly resists or obstructs the performance by one known to the person to be a peace officer *** of any authorized act within his or her official capacity." *Id.* § 31-1(a).

¶ 41     When the sufficiency of trial evidence is at issue, we must determine whether, taking the evidence in the light most favorable to the State, any rational trier of fact could have found the elements of the crime beyond a reasonable doubt. *Jackson*, 2020 IL 124112, ¶ 64. That standard applies to both direct and circumstantial evidence, and a conviction on circumstantial evidence alone may be sustained. *Id.* Taking the evidence in the light most favorable to the State includes making all reasonable inferences from the evidence in the State's favor. *People v. Eubanks*, 2019 IL 123525, ¶ 95. It is the responsibility of the trier of fact to weigh, resolve conflicts in, and draw reasonable inferences from the evidence. *Jackson*, 2020 IL 124112, ¶ 64. A trier of fact may consider the evidence in light of his or her own knowledge and observations in the affairs of life. *People v. Newton*, 2018 IL 122958, ¶ 28. Therefore, we do not retry a defendant or substitute our

judgment for that of the trier of fact regarding witness credibility or the weight of evidence. *Jackson*, 2020 IL 124112, ¶ 64.

¶ 42 The trier of fact is not required to disregard inferences that flow normally from the evidence, nor to seek all possible explanations consistent with innocence and elevate them to reasonable doubt. *Id.* ¶ 70. In other words, the State need not disprove or rule out all possible factual scenarios. *Newton*, 2018 IL 122958, ¶ 27. The trier of fact need not be satisfied beyond a reasonable doubt as to each link in the chain of circumstances if the evidence as a whole satisfies the trier of fact beyond a reasonable doubt of the defendant's guilt. *Jackson*, 2020 IL 124112, ¶ 70. A conviction will be reversed only if the evidence is so unreasonable, improbable, or unsatisfactory that a reasonable doubt of the defendant's guilt remains. *Id.* ¶ 64.

¶ 43 The testimony of a single witness is sufficient to sustain a conviction if the testimony is positive and credible, even if it is contradicted. *People v. Harris*, 2018 IL 121932, ¶ 27. Intent, knowledge, and other mental states may be proven circumstantially and inferred by the trier of fact. See *Eubanks*, 2019 IL 123525, ¶ 74. A defendant is presumed to intend the natural and probable consequences of his or her acts. *People v. Kirkpatrick*, 2020 IL App (5th) 160422, ¶ 63.

¶ 44 Here, taking the evidence in the light most favorable to the State, we find that a reasonable trier of fact could find defendant guilty of aggravated assault and resisting a peace officer.

¶ 45 As to aggravated assault, Lenos testified firmly that defendant picked up the weapon and was trying to draw it from its holster. The video bears out that defendant picked up something from the ground and then put it back down a few seconds later when Lenos told him to and threatened to tase him. While the video does not fully corroborate all of Lenos's account, it does not contradict it. It is eminently reasonable to infer that defendant's actions described by Lenos

were not involuntary but knowingly performed. Lenos "took a chance of it being a BB gun," as he put it, when he told defendant that he would tase defendant if defendant shot him with the BB gun. While Lenos did not testify expressly to being in apprehension of a battery when defendant picked up the weapon and tried to draw it, he palpably demonstrated such apprehension by pointing his taser at defendant and taking deeper cover. Moreover, Lenos telling defendant that he would tase defendant if he shot Lenos with the BB gun clearly shows his anticipation that defendant could shoot him with the BB gun once he had it out of the holster, which would not take any appreciable time. A reasonable trier of fact could apply his or her knowledge and observations of the affairs of life to infer that Lenos apprehended a battery momentarily from the weapon defendant picked up and was trying to draw. Thus, a trier of fact could reasonably infer on this evidence that defendant knowingly engaged in conduct placing Lenos in reasonable apprehension of receiving a battery and in doing so used "any device manufactured and designed to be substantially similar in appearance to a firearm, other than by discharging a firearm." 720 ILCS 5/12-2(c)(1) (West 2018).

¶ 46    Regarding resisting a peace officer, the clear testimony of Lenos and Dabros was that defendant was pulling his hands or arms away as they tried to handcuff him as Lenos was arresting him. The video shows considerable struggling between defendant and the officers for about two minutes as they tried to handcuff him, after which the officers were panting from their efforts. While they correctly admitted to not announcing their office, they testified to being in uniform and the video bears out that they were in police uniform including badges. Defendant did tell the officers that he had recent surgery and had stitches, but he also said he had court permission to fire a weapon in his backyard. Neither the officers that day nor the court at trial were obligated to take

his statements at face value. We conclude that a reasonable trier of fact could find that defendant resisted arrest as charged and was not unable to comply as he claimed then and contends now.

¶ 47    Defendant argues that he could not have been resisting an authorized act by police because their entry into the curtilage of his home was unauthorized. However, defendant did not resist the police presence on his property but his arrest. "A person is not authorized to use force to resist an arrest which he knows is being made either by a peace officer or by a private person summoned and directed by a peace officer to make the arrest, even if he believes that the arrest is unlawful and the arrest in fact is unlawful." *Id.* § 7-7. Therefore, "the resistance of even an unlawful arrest violates section 31-1." *City of Champaign v. Torres*, 214 Ill. 2d 234, 242 (2005).

¶ 48                                          IV. CONCLUSION

¶ 49    Accordingly, the judgment of the circuit court is affirmed.

¶ 50    Affirmed.

---

**No. 1-18-2583**

---

| | |
|---|---|
| **Cite as:** | *People v. Janosek*, 2021 IL App (1st) 182583 |

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 18-500408(01); the Hon. Matthew J. Carmody, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | Daniel J. Florey, of Daniel J. Florey, P.C., of Palos Heights, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Christine Cook, and Stacia Weber, Assistant State's Attorneys, of counsel), for the People. |

---