2025 IL App (1st) 241058

SECOND DIVISION
November 12, 2025

No. 1-24-1058

IN THE APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| NICOLE MILAN, | ) | Appeal from |
| | ) | the Circuit Court |
| Plaintiff-Appellant, | ) | of Cook County |
| | ) | |
| v. | ) | 22CH11940 |
| | ) | |
| THE FOREST PRESERVE DISTRICT OF COOK COUNTY, | ) | Honorable |
| | ) | Sophia H. Hall, |
| Defendant-Appellee. | ) | Judge Presiding |

JUSTICE McBRIDE delivered the judgment of the court, with opinion.
Presiding Justice Van Tine and Justice Ellis concurred in the judgment and opinion.

**OPINION**

¶ 1    Nicole Milan sued the Forest Preserve District of Cook County (Forest Preserve or forest preserve system), contending its captive animal program at the River Trail Nature Center (River Trail) in Northlake was violating the Humane Care for Animals Act (Act) (510 ILCS 70/3(a) (West 2022)), which created a public nuisance (count I), and that the program was a misuse of county tax funds (count II). She requested the Forest Preserve to relinquish its coyote and several large birds of prey to wildlife sanctuaries and for the court to enjoin it from acquiring more animals. The circuit court, however, granted the Forest Preserve's motion to dismiss for failure to state a cause of action. See 735 ILCS 5/2-615 (West 2022). In this appeal, Milan seeks reinstatement of her complaint or an opportunity to amend it.

¶ 2    The following is taken from the face of Milan's pleading and its various attachments. Milan

attached a study that Forest Preserve staff completed after she began advocating for the coyote's well-being, internal e-mail messages, correspondence with a wildlife sanctuary, and local news reports. See *Wells v. State Farm Fire & Casualty Co.*, 2020 IL App (1st) 190631, ¶ 29 (in a section 2-615 proceeding, court may consider exhibits attached to complaint, judicial admissions in record, and matters subject to judicial notice); *McCormick v. McCormick*, 118 Ill. App. 3d 455, 460-61 (1983) (written instrument being sued over and attached to complaint is dispositive of pleading's factual sufficiency, but an evidentiary attachment is not).

¶ 3     Milan has a lifelong affinity for animals, volunteers with pet rescue agencies, and has three rescue pets of her own. Her home in Northbrook is in Cook County, and she is a taxpayer. The Forest Preserve is a governmental entity that conserves nearly 70,000 acres of county land, much of which is set aside in its natural state. It maintains six nature centers, including the River Trail center that is situated within the Allison Woods. At five of the centers, "Ambassador Animals" are exhibited to educate the public about native animals and their importance to the local ecosystems. River Trail's animal program costs about $63,000 per year and relies on the support of paid and volunteer staff and a local veterinarian practice.

¶ 4     The animals include a male coyote named "Rocky," who was part of a litter born in the wild in Tennessee in 2018. While very young, the pups were mistaken for domestic dog puppies, taken to an animal shelter, and socialized for weeks before it became apparent that they were coyotes. Rocky was transferred to Walden's Puddle Wildlife Center in Tennessee, where an animal rehabilitator worked with him for several weeks to determine if he could be released. However, the rehabilitator and a veterinarian determined that Rocky had imprinted on humans, meaning that he could never live in the wild. The wildlife center searched for a suitable adopter, which led to

the Forest Preserve acquiring Rocky when he was about four months old. Milan first observed him at River Trail in October 2021 when he was several years old, and she has since visited him "dozens of times."

¶ 5     River Trail's other ambassador animals include a red-tailed hawk, a Swainson's hawk, a barred owl, a great horned owl, and a bald eagle.

¶ 6     Milan further alleged that Rocky cannot "lead[ ] a healthy and happy life" while confined as if in a "roadside zoo." He is always on display, next to a public trail and parking lot, in a cage that is 266 square feet. Instead of a burrow den and structures that would enable Rocky to avoid the commotion, he has a plastic dog cage and a hollowed log. She has seen him pace back and forth or circle around his "tiny" space and attributes this to "excessive stress and boredom" and "zoochosis," which she describes as a mental illness brought on by the stress and abnormality of his confinement. As the lone coyote, he has no opportunity to socialize. His habitat also offers "little respite from the often severe conditions of Cook County winters," and his water bowl has frozen over. Furthermore, he is treated like a domesticated dog that must "perform tricks for the public in order to get his food." The River Trail staff "have virtually no formal education or training qualifying them to make decisions" about his care and have, for example, chosen to feed him dry food formulated for domesticated dogs, without questioning whether it is healthy food for a coyote. His veterinarian, Dr. Jamie A. Abete, is similarly underqualified because she is "not a wild canid specialist." She has "repeatedly failed to competently address [his] veterinary needs," "condones" his "woefully inadequate" enclosure, and has him medicated and brought to her clinic for exams rather than conducting his care on site.

¶ 7     River Trail's birds are similarly isolated in individual, undersized cages next to the parking

lot and do not have drinkable water, adequate shelter or heated perches during the winter.

¶ 8    The displays are intended to be educational, but the public is not observing natural, wild animal behavior. Furthermore, the staff misinform visitors that the animals' strange behavior is "healthy and happy."

¶ 9    The "unsafe housing, inadequate water, and lack of protection from the elements" have upset and offended Milan in particular because she "suffers psychologically distress when she witnesses animals in conditions that [are] physically or psychologically harm[ful] *** or are otherwise inhumane." She has "experienced injury above and beyond [that of] the average visitor to [the] property due to her particular emotional attachment to the confined animals and [subsequent] efforts to help improve the animals' lives."

¶ 10    After Milan first encountered Rocky in October 2021, in December 2021, she contacted River Trail's staff, public officials, veterinary experts, animal sanctuaries, and lawyers. Towards the end of December, her attorneys asked that Rocky be surrendered to The Wild Animal Sanctuary in Keenesburg, Colorado, within five days due to northern Illinois's winter weather.

¶ 11    In January 2022, two investigators for the Cook County sheriff responded to an e-mail complaining of neglect. They met with the assistant director of the nature center and were told that the Forest Preserve had an exhibitor license from the United States Department of Agriculture, which is a federal agency that conducts regular inspections, and that the size of Rocky's enclosure exceeded the agency's requirements. The sheriff's investigators did not observe any violations of the Act and noted that Rocky "appeared to be in excellent condition." That same month, two news outlets reported about Rocky's circumstances. Fox 32 Chicago wrote that there was a petition with 2,000 signatures asking that he be moved to The Wild Animal Sanctuary and that some people

planned to attend a public meeting of the board of commissioners of the Forest Preserve to advocate for his relocation. Milan's complaint also indicates that Pat Craig, the founder of The Wild Animal Sanctuary, was able to meet with two Cook County commissioners to discuss Rocky's possible relocation to his facility in Colorado. The Chicago Tribune subsequently reported that the board of commissioners declined to transfer Rocky, despite testimony from veterinarians and animal care consultants and 4,000 petition signatures, but that the board was putting its ambassador animals program under review.

¶ 12    The next month, Craig sent a follow-up letter to the board of commissioners, the Forest Preserve, and River Trail. Craig detailed that he had "professional experience" with large carnivores, including coyotes, wolves, foxes, and other species, and that nearly a dozen coyotes kept in conditions similar to Rocky's confinement had been relinquished to live at The Wild Animal Sanctuary. Craig said that Rocky's caregivers had the confident but mistaken belief that he was happy and healthy. Craig likened Rocky to a child raised in a closet, whose needs were met, but who was not living a normal life and had "adapted to his severely restricted space and the pressure of the visiting public." He had no place to retreat or block out the sounds and smells of visitors whom he experienced as direct threats to his territory and general safety. Craig opined that Rocky's behavior was "not natural and toggle[d] between stress and boredom," but he would dramatically transform if he were living freely with other coyotes in Colorado. He could gradually join one of the sanctuary's existing packs and bond with a female. Craig offered transportation to Colorado free of charge.

¶ 13    In March 2022, Craig and the Forest Preserve continued to correspond.

¶ 14    In June 2022, as part of its review of its ambassador animals program, the board of

commissioners retained two independent veterinarians to evaluate Rocky.

¶ 15    Dr. Edgar F. Garrett, DVM MS Dipl. ACT, was a member of the "Farm Animal Reproduction Medicine & Surgery" faculty at University of Illinois Veterinary Teaching Hospital in Urbana, Illinois. Dr. Garrett gave his opinion based on an afternoon of observation, a review of Rocky's records, and the standards set out in the Large Canid Care Manual of the Association of Zoos and Aquariums (AZA manual). Dr. Garrett noted, "[t]here are no absolute standards for the size of pen for a captive coyote." The AZA manual suggested 5,000 square feet, but the authors were assuming there was a pair of canids rather than a lone animal and that the canids were "not imprinted on people and thus in need of more space to move away from [them] to reduce stress." Dr. Garrett deemed the existing enclosure to be of "adequate" size, but he recommended that it be enlarged to provide more space to move about and to accommodate privacy structures. Dr. Garrett was not concerned about the Rocky's "mental status" and observed positive and "frequent low-stress contact" with his keepers. Rocky was "agitated" by "disruptive" vehicles and other maintenance equipment, primarily snowplows and mowers, and, unfortunately, "[t]he size of the space and location of [his] enclosure [did] not lend itself to the installation of structures to ameliorate noise." Dr. Garrett approved the staff's continued use of gabapentin and trazadone for "short-term stress." Dr. Garrett also said that he had no concerns about the staff's record keeping or Rocky's nutrition or veterinary care. All in all, he praised the "exemplary management of the coyote" by the nature center's staff.

¶ 16    Dr. Alisa E. Kubala, DVM, MVS (Conservation Medicine), MRCVS, Ph.D. Candidate (Conservation Medicine), based her opinion on two site visits, staff interviews, and the same AZA guidelines referenced by Dr. Garrett. Dr. Kubala did not indicate she was currently employed but

did mention work experience "in sanctuaries throughout Africa with many species of habituated (and sterilized) wildlife [that were] hand-raised by humans, including primates and carnivores." Dr. Kubala emphasized that Rocky's care would be "acceptable" for a domesticated canine, but Rocky was a habituated wild coyote. Domestication refers to a genetic process, and domesticated dogs see the humans they live with as their family. Rocky, however, was a habituated wild coyote, meaning that he was a wild creature who did not fear humans but continued to see coyotes as his family or conspecifics (members of the same species). Dr. Kubala had observed Rocky's wild genotype behavior, such as when his strong prey drive emerged when children ran by his enclosure and when he was food aggressive towards his caretaker. The caretaker, however, misunderstood the behavior and miseducated visitors about what was occurring. For instance, the caretaker said that if Rocky caught a child, he would just lick and play with it. Also, when the coyote showed normal, sudden food aggression towards his keeper during a training session in which he was otherwise calm, "his keeper referred to this as his 'weird [Jekyll] and Hyde' moments." Dr. Kubala cautioned that this confusion between domesticated and habituated-wild behaviors could lull the caretakers into being severely injured. Dr. Kubala opined that River Trail was giving Rocky good veterinary care, good nutrition, and good training. However, based on excerpts from the AZA manual, she insisted on two improvements. One was a much larger, more complex enclosure which included features such as multiple hiding places, plantings and hedgerows that would muffle undesirable sound and vibration and give him places to go cope with unexpected loud noises. The other was that he live with another coyote, "ideally a single female or less ideally a single male," so that he "live a life suitable to a wild coyote" and "the Cook County public learn how to properly care for a special wild animal."

¶ 17 The board's review of the ambassador animals program included not only getting the opinions of Dr. Garrett and Dr. Kubala but also interviewing other national and local experts and consulting literature on the subject of captive animals. The review was a collaborative effort of eight Forest Preserve employees, took about seven months to complete, and ended in July 2022. The research was compiled into a 22-page report. Its 19 pages of attachments included the evaluations submitted by Dr. Garrett, Dr. Kubala, and the sheriff's investigators. Milan attached the complete report. The report included an "Improvement Action Plan." One of the experts had suggested using "an ethical lens" to compare what was known about Rocky's current situation (with possible improvements) and the unknown but considerable stress of being transported a long distance, placed in a different environment, and introduced to other coyotes. The Forest Preserve announced that it would build a more enriching and bigger enclosure (2000-to-2500 square feet) for Rocky in 2022 and that it would improve its interpretation and messaging about him and the other wild coyotes living in Cook County. The agency had decided against relinquishing Rocky to a wildlife sanctuary or acquiring a second coyote because moving or living with another coyote could be detrimental to him. In addition, Craig indicated that there were not enough openings for the many exotic and native captive animals in the United States in need of permanent placement and Dr. Abete testified that many "placeable, healthy, non-releasable animals are euthanized every year." The report stated that although Dr. Garrett's written evaluation did not address Rocky's companionship, in a subsequent interview, Dr. Garrett said that some coyotes are solitary and that in Rocky's case, gaining a companion might be beneficial or could be too stressful. The report emphasized that neither Dr. Garrett nor Dr. Kubala had opined that Rocky paced in an unnatural pattern or exhibited stress-induced behavior. The 12 other "leaders in the field" of captive wild

animal care that were interviewed included individuals at University of Wisconsin-Stevens Point Captive Animal Program, National Wildlife Rehabilitators Association, and Endangered Wolf Sanctuary. The Forest Preserve had also consulted the forest preserves of Illinois's Lake, Will, McHenry, Kendall, and Champaign counties about their programming with ambassador animals. After a person had expressed concern about Rocky's care to the Illinois Department of Natural Resources (DNR), "conservation police officers have found that 'the coyote is healthy" and [they] did not observe " 'inhumane treatment.' " The DNR also determined that Rocky's " 'pen is adequate' " and that " 'moving wildlife (including this coyote) is not recommended.' "

¶ 18    Milan filed suit in December 2022, alleging that Rocky was still living in the undersized cage next to the nature center's parking lot, there was no progress on the construction of a new habitat, and even the proposed new enclosure would be inadequate. She claimed that the Forest Preserve was not meeting any of the Act's four standards that it owed to Rocky and its captive eagle, owls, and hawks. See 510 ILCS 70/3(a)(1)-(4) (West 2022). It is undisputed that the coyote and birds are "[a]nimal[s]" and that the Forest Preserve is an animal "[o]wner" within the meaning of the Act. *Id.* §§ 2.01, 2.06. The Act requires that each owner provide four things: "(1) a sufficient quantity of good quality, wholesome food and water"; "(2) adequate shelter and protection from the weather"; "(3) veterinary care when needed to prevent suffering"; and "(4) humane care and treatment." *Id.* § 3(a). The Act is a criminal statute; if its minimal standards are not met, a person has committed a Class B misdemeanor, with a sentence of imprisonment of up to six months. See *id.* § 3(d); 730 ILCS 5/5-4.5-60(a) (West 2022). Milan, however, sought declaratory judgment of a public nuisance and the misappropriation of county taxpayer funds. She also sought injunctive relief halting those circumstances, as well as requiring the Forest Preserve to relinquish the animals

to wildlife sanctuaries and not subsequently obtain wild or exotic animals.

¶ 19    A section 2-615 motion challenges the legal sufficiency of a complaint based on defects that are apparent on its face. 735 ILCS 5/2-615 (West 2022). A section 2-615 motion should be granted when no set of facts could be proven under the pleadings that would entitle the plaintiff to relief. *Alpha School Bus Company v. Wagner*, 391 Ill. App. 3d 722, 735 (2009). The dismissal of a complaint for failure to state a cause of action is reviewed *de novo*. *Id.*

> " 'To pass muster a complaint must state a cause of action in two ways. First, it must
>
> be legally sufficient; it must set forth a legally recognized claim as its avenue of recovery.
>
> When it fails to do this, there is no recourse at law for the injury alleged, and the complaint
>
> must be dismissed. [Citations.] Second and unlike Federal practice, the complaint must be
>
> factually sufficient; it must plead facts which bring the claim within the legally recognized
>
> cause of action alleged. If it does not, the complaint must be dismissed.' " *Mlade v. Finley*,
>
> 112 Ill. App. 3d 914, 918 (1983) (quoting *People ex rel. Fahner v. Carriage Way West,*
>
> *Inc.*, 88 Ill. 2d 300, 308 (1981)).

¶ 20    Although a section 2-615 motion admits all well-pled facts as true, it does not admit conclusions of law or factual conclusions that are unsupported by allegations of specific facts. *Lake County Grading Co. of Libertyville, Inc. v. Advance Mechanical Contractors, Inc.*, 275 Ill. App. 3d 452, 456-57 (1995). The court may draw reasonable inferences from the well-pled facts. *Doe-3 v. McLean County Unit District No. 5 Board of Directors*, 2012 IL 112479, ¶ 16. However, if, after disregarding legal and factual conclusions, there are insufficient allegations of fact to state a cause of action, the motion should be granted. *Lake County Grading*, 275 Ill. App. 3d at 457. In Illinois state court, a complaint cannot stand on mere conclusions. *Unterschuetz v. City of Chicago*,

346 Ill. App. 3d 65, 69 (2004). Illinois is a fact pleading jurisdiction, not a notice pleading jurisdiction. *Teter v. Clemens*, 112 Ill. 2d 252, 256 (1986). The complaint's factual allegations are to be interpreted in the light most favorable to the plaintiff, but factual deficiencies cannot be cured by liberal construction. *Lake County Grading*, 275 Ill. App. 3d at 457; see *Teter*, 112 Ill. 2d at 256-57. Also relevant is the principle that exhibits that are attached to the pleading are considered to be a part of the pleading for all purposes where the pleading is founded on those exhibits. See *McCormick*, 118 Ill. App. 3d at 460-61; *Evers v. Edward Hospital Ass'n*, 247 Ill. App. 3d 717, 724 (1993). When allegations in the pleading conflict with the facts disclosed in the exhibits, the exhibit controls. *Evers*, 247 Ill. App. 3d at 724.

¶ 21    The parties first address count I. Milan argues that although she brought a novel action, Illinois courts have taken a broad, inclusive, and fact-specific approach to common law public nuisance actions. The supreme court stated in *Gilmore v. Stanmar, Inc.*, 261 Ill. App. 3d 651, 661 (1994), that the "pleading requirements are not strenuous because the 'concept of common law public nuisance *** elude[s] precise definition' [citation], and that the existence of a nuisance 'depends on the peculiar facts presented by each case.' " A public nuisance is remediable by an injunction or award of damages. *Id.* at 660. She argues that several other jurisdictions have determined that inhumane treatment of animals can form the basis for a public nuisance suit. The Forest Preserve responds that there is no Illinois precedent or analogy in favor of Milan's action, the foreign cases are inconsistent with Illinois law, and the dismissal of count I should be affirmed because Milan is unable to meet any of the elements of her intended claim.

¶ 22    Illinois has a public nuisance statute (720 ILCS 5/47-5 (West 2022)), which neither defines nor limits common law actions and only lists the 17 specific activities that have already been

recognized as public nuisances. *Gilmore*, 261 Ill. App. 3d at 661 (" 'public nuisance is not limited to those activities the legislature has declared public nuisances' " (quoting *City of Chicago v. Festival Theatre Corp.*, 91 Ill. 2d 295, 303 (1982))). Milan based her complaint on the Humane Care for Animals Act (510 ILCS 70/3(a) (West 2022)), but she was "free to plead [a] common law public nuisance without mention of [any] statute." *Gilmore*, 261 Ill. App. 3d at 661.

¶ 23    Illinois public nuisance law has paralleled section 821B of the Restatement (Second) of Torts (1979), which describes a public nuisance as " 'an unreasonable interference with a right common to the general public.' " *Gilmore*, 261 Ill. App. 3d at 660 (quoting *City of Chicago v. Commonwealth Edison Co.*, 24 Ill. App. 3d 624, 631 (1974)). Illinois has also defined a public nuisance as " ' "the doing of or the failure to do something that injuriously affects the safety, health or morals of the public, or works some substantial annoyance, inconvenience or injury to the public." ' " *City of Chicago v. Beretta U.S.A. Corp.*, 213 Ill. 2d 351, 370 (2004) (quoting *Village of Wilsonville v. SCA Services, Inc.*, 86 Ill. 2d 1, 21-22 (1981), quoting William L. Prosser, Handbook of the Law of Torts § 88, at 583 n.29 (4th ed. 1971)). In contrast to a public nuisance, a private nuisance has a much smaller scope and consists of "the substantial invasion of a person's interest in the use and enjoyment of [the person's] land." *Helping Others Maintain Environmental Standards v. Bos*, 406 Ill. App. 3d 669, 689 (2010).

¶ 24    In order to plead a public nuisance action, the plaintiff must factually allege four elements: a public right, a substantial and unreasonable interference with that right by the defendant, proximate cause, and injury. *Beretta*, 213 Ill. 2d at 369.

¶ 25    Looking at the first element, public rights include "the rights of public health, public safety, public peace, *** and public convenience." *Id.* at 370-71 (citing Restatement (Second) of Torts

§ 821B(2)(a) (1979)). " 'A public right is one common to all members of the general public. It is collective in nature and not like the individual right that everyone has not to be assaulted or defamed or defrauded or negligently injured.' " *Id.* at 373 (quoting Restatement (Second) of Torts § 821B cmt. g (1979)).

¶ 26    Public health nuisances include the "keeping [of] diseased animals or the maintenance of a pond breeding malarial mosquitoes." Restatement (Second) of Torts § 821B cmt. b (Sept. 2025 Update). Illinois prohibits letting animal carcasses, filth, or foul substances accumulate in a way that endangers health or is offensive; dumping animal carcasses into streets, sewers, or bodies of water; and polluting springs, rivers, streams, ponds, or lakes in a way that injures others. 720 ILCS 5/47-5(1)-(3) (West 2022). Nuisances to public safety have included letting vicious dogs run free, storing explosives in the midst of a city, blasting, shooting off fireworks in the public streets, and having a structurally unsafe building. *Beretta*, 213 Ill. 2d at 371-72; Restatement (Second) of Torts § 821B cmt. b (Sept. 2025 Update). The public nuisance of imposing on the public peace has included loud and disturbing noises from unruly taverns and dance halls, lewd behavior in an adult bookstore, and the operating an unlicensed massage parlor. *Beretta*, 213 Ill. 2d at 372; Restatement (Second) of Torts § 821B cmt. b (Sept. 2025 Update). "Public comfort has been affected by odors, fumes, dust, and other sources of pollution." *Beretta*, 213 Ill. 2d at 372. And finally, examples of a nuisance to public convenience include obstructing a navigable stream or public highway. Restatement (Second) of Torts § 821B cmt. b (Sept. 2025 Update). None of these examples of a public nuisance resemble Milan's action.

¶ 27    Public nuisance cases that involve live animals are few and far between and they are quite dissimilar to Milan's suit. Milan cites no Illinois authority, but the Forest Preserve cites *Oehler v.*

*Levy*, 234 Ill. 595, 596-97 (1908), in which a stable owner was keeping about 20 horses in what became a residential area in Chicago. The horses were filthy, and their manure and urine was causing noxious odors that offended the residents of the adjacent three-story apartment building and affected their health. *Id.* at 596, 600. The residents also had difficulty sleeping because the horses were put to work overnight as part of a newspaper delivery service (in 1908), and there was a staff of about a dozen people who were loud and vulgar. *Id.* at 596-97. The situation worsened, however, when the stable was relocated from the basement to the first floor, horse urine began draining to the basement to the extent that it penetrated the walls of the brick apartment building, and the stable owner began storing the manure instead of hauling it away. *Id.* at 603-04. All in all, the brick flats were unhealthy and undesirable, and their rental income was depressed. *Id.* at 597. The court granted injunctive relief requiring the stable owner to maintain more sanitary conditions and to discontinue the loud obscene and profane language. *Id.* It is unclear to this court, however, whether the apartment building owner, who occupied one of the flats, intended to bring a public nuisance claim, as opposed to a private nuisance claim regarding his real property. The court did not specify "public" or "private," used the general terms "nuisance" and "maintaining a nuisance upon [the stable owner's] premises" (*id.* at 596, 600), and the dispute was about waste and noise that bothered the renters and reduced the building income, rather than impacted the general public of Chicago. The only facts that suggest a *public* nuisance are that when the horses' quarters were relocated from the basement to the upper floor, the stable owner constructed a driveway across the sidewalk in order to take the horses to and from the street. *Id.* at 597.

¶ 28    The Forest Preserve also cites a decision that was issued about a century later, *Helping Others Maintain Environmental Standards*, in which an injunction stopped the construction of a

" 'megadairy' " in Nora, Illinois, that would have held over 13,500 animals and required at least three massive ponds of livestock waste. *Helping Others Maintain Environmental Standards*, 406 Ill. App. 3d at 670-71, 674. The neighbors sued to prevent air pollution, ground water contamination from the seepage of animal waste, increased noise, diminution of their property values, and other problems. *Id.* at 674. The opinion makes clear that the residents intended to bring both private nuisance and public nuisance claims. *Id.*

¶ 29 The Forest Preserve argues that these two cases, infrequent as they are, illustrate that Illinois recognizes that keeping animals can constitute a public nuisance, but it is only because of the effect that the animals have on traditional public rights to be free of offensive odor, vicious attack, and excessive noise. We agree that Milan's allegations bear no resemblance to this precedent.

¶ 30 Milan does not cite any Illinois authority involving live animals and public nuisance. Her appeal relies entirely on four non-Illinois cases for the proposition that an alleged violation of an Illinois statute is an actionable public nuisance. In *Beretta*, however, the Illinois Supreme Court rejected the plaintiffs' attempt to support a novel public nuisance claim with similar claims from other jurisdictions. See, *e.g.*, *Beretta*, 213 Ill. 2d at 367-68. The plaintiffs were government entities who sued gun manufacturers, distributors, and dealers in an attempt to reduce the incidence of gun violence and recoup expenses that flowed from the illegal possession and use of firearms. *Id.* at 355-56. The supreme court declined to rely on a similar Ohio lawsuit, *City of Cincinnati v. Beretta U.S.A. Corp.*, 95 Ohio St. 3d 416, 2002-Ohio-2480, 768 N.E.2d 1136, in which the court held that gun manufacturers and dealers can be liable for a public nuisance based on misuse of the legal product they sell. The Illinois Supreme Court was not persuaded by the Ohio Supreme Court's

reasoning and noted that Illinois is a fact pleading jurisdiction, while Ohio is a notice pleading one. *Beretta*, 213 Ill. 2d at 367-68. Allegations of fact, rather than mere legal conclusions, are required to state a cause of action under Illinois law. *Mlade*, 112 Ill. App. 3d at 918. The Illinois court indicated that when deciding whether a complaint should be dismissed on the pleadings, a complaint's survival in a notice pleading jurisdiction has little or no relevance to whether the pleading meets the heavier burden imposed by Illinois. *Beretta*, 213 Ill. 2d at 368. The Ohio court's decision based only on skeletal notice pleading allegations did not meet the Illinois standard requiring specific common law or statutory support to declare a public nuisance. Nevertheless, one of the four cases that Milan cites is *Collins v. Tri-State Zoological Park of Western Maryland, Inc.*, 514 F. Supp. 3d 773 (D. Md. 2021), in which a court denied a motion to dismiss by applying federal notice pleading standards to allegations that a roadside zoo's operations were contrary to public morals, violated the federal Animal Welfare Act (7 U.S.C. §§ 2131-59 (2018)), and also violated Maryland's animal cruelty statute (Md. Code Ann., Crim. Law § 10-604 (West 2020)). *Collins*, 514 F. Supp. 3d at 778. Like the Ohio *Beretta* decision, the *Collins* ruling concerned bareboned notice pleading allegations that do not meet Illinois's fact pleading standard. Furthermore, *Collins* is factually distinguishable, as it involved horrific conditions that were "patent" and had been "well documented" in repeated citations from the United States Department of Agriculture. *Id.* at 777, 781.

¶ 31     No more helpful to Milan's appeal is *Pennsylvania Society for the Prevention of Cruelty to Animals v. Bravo Enterprises, Inc.*, 237 A.2d 342, 348-49 (Pa. 1968), in which the Supreme Court of Pennsylvania held that the plaintiff lacked standing to bring a claim to enjoin a planned bullfight as a public nuisance. Her reliance on *Animal Legal Defense Fund v. Lucas*, No. 2:19-40,

2022 WL 16575761 (W.D. Pa. Nov. 1, 2022) (applying Pennsylvania law) is similarly misplaced, as the analysis focuses on issues that are irrelevant here: whether a business invitee can maintain a claim of public nuisance under Pennsylvania law, whether the nuisance claim can proceed when the defendant meets regulatory requirements for the keeping of animals, and the burden of proof for showing a certain violation of the federal Endangered Species Act of 1973 (16 U.S.C. §§ 1531-44 (2018)). Milan's remaining out-of-state case, *Kuehl v. Sellner*, No. 19-1980, 2021 WL 3392813 (Iowa Ct. App. Aug. 4, 2021), is not persuasive because Iowa has its own framework for addressing public nuisance, while Illinois employs the Restatement (Second) of Torts § 821B (Sept. 2025 Update). See *Beretta*, 213 Ill. 2d at 370-71; *Gilmore*, 261 Ill. App. 3d at 660 ("Illinois common law nuisance parallels the nuisance law outlined in the Restatement.").

¶ 32    Thus, none of the authority helps Milan show the first of the four elements in a public nuisance action—the existence of a public right (*Beretta*, 213 Ill. 2d at 370)—with respect to the kept animals at River Trail. She has not shown that the nature center's ambassador animals program "injuriously affects the safety, health or morals of the public, or works some substantial annoyance, inconvenience or injury to the public." (Internal quotation marks omitted.) *Id.*

¶ 33    Given Milan's inability to meet the first prong, we do not reach the parties' arguments about the three other elements of a public nuisance claim. Nor do we reach other arguments, such as her contention that in order to bring a public nuisance claim, she needed to allege an injury different from the injury suffered by the public at large, and that her allegations met that pleading standard. We find that her public nuisance claim is not viable and was properly dismissed for this reason.

¶ 34    Even assuming that Illinois recognized her novel action, Milan did not factually allege a

violation of the Act. At 26 pages, her pleading is very long but consists almost entirely of descriptive narrative, unsupported conclusions of fact, and unsupported conclusions of law. We are largely disregarding the sections she entitled "INTRODUCTION" and "THE PARTIES" as they are unnecessary narrative about her, her efforts to have Rocky relocated, and what he would experience in the environment she would choose for him. We are focusing on the purported "FACTUAL ALLEGATIONS" that begin on page four. We note that this section includes 11 photos that are so badly reproduced that they are indiscernible, despite Milan's captioning, and that the photos contribute nothing to her complaint.

¶ 35    She argues that she pled violations of all four of the Act's general standards. She argues that a lack of "sufficient quantity of good quality, wholesome food and water" (510 ILCS 70/3(a)(1) (West 2022)) is indicated by allegations that Rocky's meals included dry food that was created for domesticated dogs and that he and the birds had frozen water bowls. She argues that a lack of "adequate shelter and protection from the weather" (*id.* § 3(a)(2)) appears in her allegations that Rocky did not have a burrow den or other structure allowing him to get away from the elements and the public and that the birds similarly spend their winters exposed to the weather. The absence of "veterinary care when needed to prevent suffering" (*id.* § 3(a)(3)) purportedly appears in her allegations that Rocky's usual vet is not a wild canid specialist and that instead of coming to see him, she has Rocky medicated and brought to her clinic. And finally, an overall lack of "humane care and treatment" (*id.* § 3(a)(4)) purportedly appears in allegations that include (1) Rocky engages in "stress-pacing"; (2) his caretakers "have virtually no formal education or training [qualifying them to make decisions about his care]"; and (3) one staff member said in an internal e-mail that she was a "proponent" of "releas[ing] an animal whenever possible" and that a coyote

- 18 -

that does not "need[ ] to be kept in captivity" "should *** [be] reconditioned and released."

¶ 36    We emphasize that the Act states general standards for owner conduct and does not mandate a specific level of care or the best possible care or an adherence to any particular best practices. Food and water are to be "sufficient," protection from the weather is to be "adequate," and veterinary care is to be provided "when needed to prevent suffering." Previous courts have determined that the fourth requirement, overall "humane care," is to be based on "common sense." (Internal quotation marks omitted.) *People v. Kirkpatrick*, 2020 IL App (5th) 160422, ¶ 47 (experienced veterinary violated the Act and the Veterinary Medicine and Surgery Practice Act of 2004 (225 ILCS 115/1 *et seq.* (West 2014)) when caring for and treating pets in her residence); *People v. Curtis*, 407 Ill. App. 3d 1042 (2011) (resident of two-bedroom townhouse violated statutory duties to her pet cat after taking in 82 feral or stray cats). In our opinion, a commonsense approach to all four requirements is consistent with the principle that a statute's language is to be read with its plain and ordinary meaning. See *Advincula v. United Blood Services*, 176 Ill. 2d 1, 16-17 (1996).

¶ 37    With respect to the basic need for "a sufficient quantity of good quality, wholesome food" (510 ILCS 70/3(a)(1) (West 2022)), Milan cites her allegation that the coyote was thoughtlessly given domesticated dog food, in the amount recommended for dogs, by a person who had "virtually no formal education or training qualifying them to make decisions about Rocky's care." This allegation was conclusory because it did not state why including dog food in Rocky's meals was inappropriate. We do not accept conclusions of law or fact that are not supported by specific facts. *Mlade*, 112 Ill. App. 3d at 921. She did not allege, for instance, that specialized commercial coyote food was necessary or even exists. She failed to specify that he was malnourished, overfed, or

underfed when given the amount of dry, commercial dog food recommended for dogs. Her pleading simply gave no factual indication that the food regimen was not humane. Furthermore, she criticized the caretakers' lack of schooling, but she is opining about Rocky's diet from her perspective as a lay person herself who lacks the credentials and expertise necessary to opine on what a captive coyote should be fed. Her subjective disdain is not a factual allegation that he was being misfed.

¶ 38    Furthermore, she makes this conclusory allegation despite contrary statements in her own exhibit. Milan was critical of a staff member's qualifications, but the Forest Preserve's report indicated that the staff was trained and one individual was even a licensed animal rehabilitator. Also, training and regular consultation were being provided by a senior wildlife biologist who co-founded the Urban Coyote Research Project and had more than 30 years' experience with Cook County's wildlife. Dr. Kubala's evaluation indicated that River Trail was meeting the nutrition criteria in the AZA manual specific to large canids. She included quotes from the AZA manual: " 'Generally, the nutritional requirements of non-domestic large canids can be met by feeding a nutritionally complete, *commercial dog food*.' " (Emphasis added.) Also, " 'Diets fed to coyotes in zoos should consist of a nutritionally complete, *dry dog food*, with supplemental fruits, vegetables, and whole prey items such as mice, small rats, quail or chicks." (Emphasis added.) The other independent veterinarian, Dr. Garrett, documented that Rocky had a good quality diet that centered around commercial, dry food:

> "[Rocky's diet originated from] recommendations by the staff at the Brookfield Zoo
> and [is] modified based on [his] response ***. The diet uses a commercial dry food as the
> core ingredient and that is supplemented with mice, rats, fish, cheese and vegetables. The

additional ingredients are in keeping with recommendations for the feeding of large canids and simulate the natural diet. *** The ingredients are purchased from Brookfield Zoo so the mice, etc. are known to be safe for the coyote."

¶ 39    Thus, Milan's allegation about Rocky's diet is not only a subjective, conclusory and deficient allegation, it appears to be an incorrect one, as two independent veterinarians, backed up by the AZA manual and staff at the Brookfield Zoo, considered commercial dry dog food to be an appropriate foundation of Rocky's diet.

¶ 40    As for the requirement for sufficient, good quality water, Milan alleges that at one point "[i]n or around January 2022," she "observed that the water bowls in several of the animals' cages had frozen over," that is, she pled a single, temporary condition that common sense indicates is not a violation of the Act. Her allegation is deficient. Also, one of her exhibits undermines her claim. That the situation was temporary and rectified is indicated by the Cook County Sheriff's Police Department incident report dated January 11, 2022, in which the investigators reported that Rocky had access to liquid water. The incident report supports the commonsense expectation that the frozen water that Milan alleges that she saw once in January 2022 was an anomaly. The investigators even specified that they "observed no violations of the Illinois Humane Care for Animals Act."

¶ 41    Milan also purports to allege insufficient protection from the weather in that Rocky was given a plastic dog kennel and hollow log covered with a towel in the colder months and the wild birds live outside without heated perches. Obviously, however, if the captive animals had been left wild, they would be living outside year-round, without any added heat when the weather turned cold. Furthermore, there is no factual basis for her personal opinion that what has been provided

is not "adequate shelter and protection." 510 ILCS 70/3(a)(2) (West 2022). She expresses her subjective and nonexpert preference for the coyote to have "a burrow den or other structure that maintains a reasonable temperature," but she does not factually indicate that the existing habitat does not maintain a reasonable temperature. She is opining as a layperson. She criticizes the River Trail staff for addressing Rocky's "day-to-day needs and general health" despite a lack of "formal education or training qualifying them to make decisions about [captive animal] care," but Milan does not claim to have any schooling of any kind, let alone specialized training in the care of canids. She describes herself as someone who "grew up with birds, dogs, cats, lizards, and snakes" and now "volunteers with pet rescues and has three rescue pets." Her complaint is based on her unqualified belief that River Trail should be providing its captive animals with some other shelter during winter weather.

¶ 42     Not only is her layperson's statement conclusory, but it also conflicts with what the experts said. Other than expressing concern about the size of the enclosure, Dr. Kubala commented positively about Rocky's habitat during the colder months and specified that Rocky did not need a heated habitat. Citing the AZA manual regarding temperature and environment, Dr. Kubala said, " 'The coyote tolerates cold weather, but should be provided with a dry den structure, with dry bedding such as straw for shelter from rainy or windy conditions. They do not require supplemental heating in their dens, and do not generally require specific access to an enclosed, climate-controlled environment.' " Dr. Kubala did not choose a *burrow* den, dispensed with any need for heat or a heated enclosure at River Trail, and only expressed a preference for straw bedding in Rocky's shelter. The other independent veterinarian, Dr. Garrett, said that "[t]he den is bedded with straw in the cold season and this, coupled with the sheltered nature of the area in the trees makes the

structure well suited for the cold season." These expert opinions flatly contradict Milan's conclusory allegations that Rocky's shelter and protection are inadequate.

¶ 43    Milan makes clear that she wants Rocky to be turned over to The Wild Animal Sanctuary, which has burrow dens. However, even its executive director, Craig, did not describe a burrow den as a source of protection from the weather. His main concerns were that Rocky should live in a larger habitat so that he could choose to escape the pressure of being on display and should have a more natural habitat/lifestyle that included freedom to roam and choose his companions. Craig never suggested that Rocky's existing habitat does not provide "adequate shelter and protection from the weather." Milan alone came to this conclusion. She alleged no facts requiring a burrow den, despite professing that she "reached out to veterinary experts and animal sanctuaries." Also, it is ironic that she advocates putting Rocky in Craig's care when he is another lay person who does not claim to have any "formal education or training qualifying [him] to make decisions about [captive animal] care."

¶ 44    Milan also pleads a lack of adequate veterinary care, but she alleges that veterinary care is provided. The statute requires only "veterinary care when needed to prevent suffering" (*id.* § 3(a)(3)) and does not dictate a specific level of care.

¶ 45    According to Milan, it is a statutory violation that the usual vet, Dr. Abete, is "not a wild canid specialist," meaning that she "is not qualified to care for Rocky." Milan also criticizes Dr. Abete for medicating and transporting Rocky so that she can see him at Niles Animal Hospital and Bird Medical Center, rather than at the nature center.

¶ 46    Milan is making a factual conclusion that there is such a thing as "a wild canid specialist" and that a lack of highly specialized veterinary attention violates the Act. She also assumes,

without factual basis, that Rocky would receive better vet care at the nature center, instead of being transported to a vet practice that has diagnostic equipment and other resources devoted to animal care.

¶ 47    In addition, Milan cannot reconcile her conclusory allegations about vet care with her exhibits. The Forest Preserve's study noted that Dr. Abete's practice is "[r]ecognized as one of the foremost veterinary practices in the nation" and has "an outstanding in-house laboratory." Also, contrary to the allegation that Rocky is always taken to the vet practice, the study mentions that "[t]he staff at Niles Animal Hospital provide yearly exams and regularly checks on the animals with both on-site care and at its facility in Niles." After Dr. Garett evaluated Rocky and considered his medical records, he reported that Rocky is "healthy" and "I have no concerns about the veterinary care program for the coyote." The other independent veterinarian, Dr. Kubala, specified, "In my opinion, [River Trail] has provided good veterinary care."

¶ 48    As part of her criticism of Dr. Abete's "veterinary care when needed to prevent suffering" (*id.*), Milan alleges that Dr. Abete fails to "mitigate [Rocky's] stress-induced behaviors" by "addressing their root cause: Rocky's inhumane confinement and treatment." This allegation is better addressed with the allegations that Milan directs at the final prong of the Act, "humane care and treatment." *Id.* § 3(a)(4). Under this heading, Milan pleads that Rocky experiences inhumane treatment because he is being kept in a small enclosure where he engages in "obvious stress-induced pacing" throughout the day, has to "perform dog tricks to earn food," lacks a burrow den and a companion, and receives day-to-day care from people who lack the necessary "formal education or training."

¶ 49    None of these allegations are factual indications of violation of the Act. Milan lacks the

qualifications to declare these aspects of Rocky's care to be wrong, and she fails to tie her allegations to any objective requirement. For instance, her allegation that he has a "small," even "tiny," enclosure of only "266 square feet" is not grounded in an authoritative source indicating that a captive coyote's habitat should be at least a certain size. A plaintiff is not required to plead evidence but does need to plead the ultimate facts to be proved. *Beretta*, 213 Ill. 2d at 369; *Carriage Way West*, 88 Ill. 2d at 308. Proving the allegation that Rocky's habitat is 266 square feet would prove that the enclosure is 266 square feet. It would not prove that the enclosure does not meet his needs. There would be no legal consequences. She included a photo that is so poorly reproduced that it is indecipherable and does not communicate that Rocky's enclosure is undersized. Similarly, out of thin air, Milan alleges, "As a coyote, Rocky requires freedom to roam over acres of space as well as social engagement with other coyotes." She also creates the concern, "As a coyote, Rocky needs a structure like a burrow den where he can go to both get away from the elements and stay warm during cold winters, and avoid the loud noises and other disturbances made by children and cars coming and going to and from the nature center all day." Neither of the "[a]s a coyote" allegations is founded on an informed standard, and the court does not independently know that a coyote "requires *** acres of space" and "needs a structure like a burrow den." In addition, as we pointed out above in conjunction with the statutory requirement for "adequate shelter and protection" (510 ILCS 70/3(a)(2) (West 2022)), Milan would choose a burrow den, but she has not factually alleged that Rocky is being treated inhumanely because he does not have one. Furthermore, repeatedly characterizing the enclosure as "solitary confinement" is an inappropriate attempt to inflame sympathy rather than plead facts. She alleges her personal preferences for Rocky's habitat, instead of actionable violations of the Act. Her allegation that

Rocky "constantly paces around his cage throughout the day" implies that Milan is at the nature center all day and every day observing his behavior, which is a patent exaggeration. She also fails to factually describe the "dog tricks" that he purportedly performs to earn food, and she does not factually state why doing so is detrimental to him and should not be considered humane care and treatment. Then there is the allegation that River Trail staff have virtually no relevant education or training, which is an unsubstantiated conclusion that the Act requires certain qualifications that the Act does not require.

¶ 50    The conclusory allegations of inhumane care and treatment also conflict with her exhibits. Dr. Garrett noted that there were "no absolute standards for the size of pen for a captive coyote," described the current habitat as "adequate" and said that "expansion of the enclosure is not an urgent need." He and Dr. Kubala suggested that the enclosure be enlarged, but neither of them opined that the existing enclosure was in any way inhumane. Dr. Kubala did encourage companionship, and Craig offered to take Rocky to Colorado where he could transition to a larger habitat and companionship, but neither of them said that the River Trail facilities violated the Act. As for the lack of a fellow coyote, the study indicated that according to the Urban Coyote Research Project, more than a third of coyotes tracked over 22 years have been solitary animals. The Forest Preserve expressed concern that transferring Rocky to another facility for the social benefits could be stressful and even harmful to him. Unlike Milan, it seems like the Forest Preserve made an educated choice about what was humane.

¶ 51    With respect to Rocky's supposed "constant pac[ing] around his cage throughout the day," Dr. Garrett observed that Rocky was "more active when people were in the area," "returned to what seemed to be a baseline level soon after the visitors left," and then, while Dr. Garrett kept

stationary, Rocky "moved about in a slow steady manner and periodically sat or stood still while listening and sniffing the air." Dr. Garrett did not document the so-called "stress-induced pacing" that Milan alleged she observes when she is "constantly" at River Trail, and Dr. Garrett did not characterize Rocky's behavior negatively. Similarly, while Dr. Kubala not only advocated for a larger habitat and a companion, she did not document any "stress-induced" pacing. Milan independently alleges that Rocky "stress pace[s]" and from her lay perspective she has diagnosed him with "zoochosis"—"a form of animal psychosis" that is brought on by his confinement.

¶ 52    Regarding the "perform[ance] [of] dog tricks to earn food," Dr. Garrett, an actual expert, documented that Rocky follows commands to sit-stay, go in his den, and raise a paw and that his encounters with the staff were good for his mental and physical health:

"The two feeding periods each day are coupled with interactions with the keepers. *** [Rocky] responded to the keepers in a positive manner and seemed to thoroughly enjoy interacting with the keepers. ***

Purpose-driven training is incorporated ***. [It] serves as a source of mental stimulation for the coyote and facilitates *** activities the keepers need to perform. Basic commands like sit and stay reduce the risk of escape as keepers enter and exit the pen; entering a den/crate provides a method to move the coyote out of the pen when necessary; extending a forelimb while sitting it allows examination of the limbs. *** [F]requent low-stress contact allows the keepers to examine the coyote closely and touch him all over his body so that changes can be recognized promptly."

¶ 53    Milan claimed that River Trail's captive birds of prey were likewise not receiving "humane care and treatment." *Id.* § 3(a)(4). Her appellate arguments, however, do not address this portion

of her complaint, and we will not be addressing it either. An appellant forfeits review of issues that are ill defined and insufficiently presented in the opening appellate brief. *People ex rel. Illinois Department of Labor v. E.R.H. Enterprises, Inc.*, 2013 IL 115106, ¶ 56; Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) (arguments not raised in the opening brief are considered forfeited and may not be raised in a reply brief, at oral arguments, or in a petition for rehearing).

¶ 54 This complaint does not present facts upon which judicial relief could be granted. It conveyed Milan's baseless opinions but not any violations of the Act. Her exhibits contradict her allegations and demonstrate there is no set of facts that can be proved that would entitle Milan to relief.

¶ 55 For these reasons, we find that the court did not err by dismissing count I.

¶ 56 In count II, Milan sought a judicial declaration that the Forest Preserve was misappropriating taxpayer funds and an injunction ceasing the misuse. In count II, she specified:

> "131. Defendant fails to supply 'Ambassador Animals' with necessary water, shelter, veterinary care, and humane care and treatment in violation of the Illinois Humane Care for Animals Act.
>
> 132. Defendant's inhumane care for 'Ambassador Animals' constitutes a misappropriation of Cook County taxpayer funds, including taxes paid by Plaintiff Nicole Milan.
>
> 133. Unless restrained, Defendant will continue to misappropriate Cook County taxpayer funds to finance the inhumane care of animals under the 'Ambassador Animals' program in violation of Plaintiff's rights."

¶ 57 She acknowledges that count II was based on the allegations in count I that we found to be inadequate. A plaintiff who relies on municipal taxpayer standing must show that the municipality

has expended funds on allegedly *illegal* elements of the disputed practice. *Illinois Ass'n of Realtors v. Stermer*, 2014 IL App (4th) 130079, ¶ 29; *Barber v. City of Springfield*, 406 Ill. App. 3d 1099, 1102 (2011) ("The key to taxpayer standing is the plaintiff's liability to replenish public revenues depleted by an allegedly *unlawful* governmental action." (Emphasis added.)). "Taxpayer standing is based 'upon the taxpayers' ownership of [public] funds and their liability to replenish the public treasury for the deficiency caused by such misappropriation. The misuse of these funds for *illegal* or unconstitutional purposes is a damage which entitles them to sue.' " (Emphasis added.) *Illinois Ass'n of Realtors*, 2014 IL App (4th) 130079, ¶ 29 (quoting *Barco Manufacturing Co. v. Wright*, 10 Ill. 2d 157, 160 (1956)). Milan's allegations are deficient.

¶ 58    Furthermore, section 40 of the Cook County Forest Preserve District Act (70 ILCS 810/40 (West 2022)) gives the Forest Preserve authority to establish and maintain the Ambassador Animals program and expend taxpayer funds on the operations. That statute states:

> "The corporate authorities of forest preserve districts, having the control or supervision of any forest preserves, may erect and maintain within such forest preserves, under the control or supervision of such corporate authorities, edifices to be used for the collection and display of animals as customary in zoological parks, and may collect and display such animals *** out of the tax provided in Section 41." *Id.*

¶ 59    We conclude that count II does not factually plead that public funds are being expended on the illegal, inhumane care of captive animals, only that Milan dislikes or disagrees with the policies about the care and treatment of those animals. The tax money is being spent as authorized by statute and there are no facts that Milan could allege that would amount to a claim of the misappropriation of taxpayer money. The circuit court did not err in dismissing count II as factually

1-24-1058

deficient.

¶ 60    Milan's last request is, if we determine her claims are generally viable but her pleading is infirm, that we remand with directions to the circuit court to grant leave to replead. The Forest Preserve responds that an amendment would be futile and that she waived the opportunity.

¶ 61    Milan suggests she was caught off guard in the circuit court. Her response to the motion to dismiss concluded with the perfunctory statement, "In the alternative, should this Court grant Defendant's motion in whole or in part, Plaintiff requests leave to amend her Complaint." The circuit court initially dismissed only count I, at which point Milan abandoned any interest in repleading the claim and asked for an Illinois Supreme Court Rule 308(a) (eff. Oct. 1, 2019) or Illinois Supreme Court Rule 304(a) (eff. Mar. 8, 2016) finding so that she could take an interlocutory appeal as to count I. In a cross-motion, the Forest Preserve sought either reconsideration of the court's retention of count II or the entry of Rule 308(a) language so that the Forest Preserve could be the interlocutory appellant. See Ill. S. Ct. R. 308(a) (eff. Oct. 1, 2019). The circuit court entered a briefing schedule and hearing date for the cross-motions. However, after receiving the briefs, the court decided to strike the hearing date, grant reconsideration as to count II and dismiss it with prejudice, and then deny Milan's motion as moot. Milan's appeal from the final judgment order followed.

¶ 62    Milan was not somehow deprived of the capacity to request leave to file an amended complaint. She demonstrated her commitment to her original pleading not once, but twice. She committed to count I when she sought interlocutory appeal language instead of seeking reconsideration and/or leave to amend count I. She made a strategic choice. Then she stood by count II when she took an appeal from the final judgment order instead of seeking reconsideration

and/or leave to amend count II, followed by an appeal as a matter of right.

¶ 63    The viability of her cause of action now turns solely on the sufficiency of her existing pleading. See *Mlade*, 112 Ill. App. 3d at 917 (when the circuit court strikes a complaint and the plaintiff does not ask for leave to amend, the cause of action stands or falls upon the contents of the stricken pleading); *Robbins v. City of Madison*, 193 Ill. App. 3d 379, 381 (1990) (same).

¶ 64    Furthermore, Milan has given no indication of how she might successfully state a cause of action in count I or count II, because she has not filed a proposed amendment. "A party desiring to file an amended pleading should incorporate the proferred amendment in his record on appeal. Otherwise, the reviewing court has no means of determining whether the second attempt to state a cause of action would have been any more successful than the first." *Zamouski v. Gerrard*, 1 Ill. App. 3d 890, 898 (1971). We would be speculating that someone with a demonstrated inability to plead would suddenly manifest the ability on remand.

¶ 65    We decline to unfairly burden judicial resources and the defendant. Milan's request is denied.

¶ 66     The circuit court's dismissal of Milan's claims of public nuisance and misuse of taxpayer funds is affirmed.

¶ 67    Affirmed.

*Milan v. Forest Preserve District of Cook County*, **2025 IL App (1st) 241058**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 22-CH-11940; the Hon. Sophia H. Hall, Judge, presiding. |
| **Attorneys for Appellant:** | Kelli Mulder and Michael J. Kraft, of Kirkland & Ellis LLP, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Thomas G. DiCianni and Mary Jean Dolan, of Ancel Glink, P.C., of Chicago, for appellee. |